**16-1057**

IN THE

# United States Court of Appeals

## FOR THE FEDERAL CIRCUIT

❖

MICH & MICH TGR, INC., a corporation of Delaware,

*Plaintiff-Appellant,*

— v. —

BRAZABRA CORPORATION, a corporation of Massachusetts,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK
JUDGE KIYO A. MATSUMOTO
2:14-CV-05758-KAM-AKT

## CORRECTED BRIEF FOR PLAINTIFF-APPELLANT

GERARD F. DUNNE
LAW OFFICE OF
   GERARD F. DUNNE, P.C.
41 Union Square, Suite 1125
New York, New York 10003
(212) 645-2410

*Attorneys for Plaintiff-Appellant*

FORM 9.  Certificate of Interest

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Mich & Mich TGR, Inc.     **v.**     Brazabra Corp.

Case No.    16-1057

## CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party)

Mich & Mich TGR, Inc.     certifies the following (use "None" if applicable; use extra sheets if necessary):

1.     The full name of every party or amicus represented by me is:

Mich & Mich TGR, Inc.

2.     The name of the real party in interest (Please only include any real party in interest NOT identified in Question 3. below) represented by me is:

Mich & Mich TGR, Inc.

3.     All parent corporations and any publicly held companies that own 10 percent of the stock of the party or amicus curiae represented by me are listed below. (Please list each party or amicus curiae represented with the parent or publicly held company that owns 10 percent or more so they are distinguished separately.)

None

4. ☐    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court (and who have not or will not enter an appearance in this case) are:

None

10/21/2015
Date

/Gerard F. Dunne/
Signature of counsel

Please Note: All questions must be answered

cc: _____

Gerard F. Dunne
Printed name of counsel

Reset Fields

## CORPORATE DISCLOSURE STATEMENT

The Appellant, MICH & MICH TGR, INC.,  does not have any corporate parents and no publically-held corporation owns more than 10 % of the stock of MICH & MICH TGR, INC.

# TABLE OF CONTENTS

**CORPORATE DISCLOSURE STATEMENT** ................................................  i

**TABLE OF CONTENTS** ...................................................................  ii

**TABLE OF AUTHORITIES** ............................................................  iv

**STATEMENT OF RELATED CASES** ...............................................  vii

**JURISDICTIONAL STATEMENT** ....................................................  1

**ISSUES PRESENTED FOR REVIEW** ...............................................  2

**STATEMENT OF THE CASE** ..........................................................  3

**STATEMENT OF THE FACTS** ........................................................  4

    **I.**      **United States Patent Number RE43,766** .........................  4
    **II.**     **The Language of the Claims at Issue**................................  5
    **III.**   **The Claim Construction of the District Court**...............  7
    **IV.**   **The Accused Device of Appellant Brazabra**...................  7

**SUMMARY OF THE ARGUMENT** ..................................................  9

**ARGUMENT** ...................................................................................  11

    **I.**      **Standard of Review**..........................................................  11

    **II.**     **Claim Construction of the term
                "elongated member" in Claim 12**......................................  11

         A.     The district court incorrectly added the limitation
                   that the "elongated member" of Claim 12 must be
                   the "main structure" of the apparatus based on the

use of the term "elongate main portion" in the
specification, and prior apparatus claims ..................................... 11

B.    The definition of the elongated member of
Claim 12  provided by the district court would
render Claims 13 and 15 meaningless in
violation of the doctrine of claim differentiation ........................ 13

III.    **Literal Infringement of Claim 12**...................................................... 16

IV.    **Infringement of Claim 12 Under the
Doctrine of Equivalents**.................................................................. 16

V.    **Court Below Improperly Found the
Defense of Ensnarement** ................................................................ 23

**CONCLUSION** ................................................................................... 25

**STATEMENT OF RELIEF SOUGHT** .............................................. 25

# TABLE OF AUTHORITIES

## <u>CASES</u>

*AquaTex Indus. v. Techniche Solutions*,
  479 F.3d 1320, 1327-28 (Fed. Cir. 2007) ........................................................ 22

*Bernhardt, L.L.C. v. Collezione Europa USA, Inc.*,
  386 F.3d 1371, 1384 (Fed. Cir. 2004) ............................................................ 22

*Bicon, Inc. v. Straumann Co.*,
  441 F.3d 945, 950 (Fed. Cir.2006) ............................................................ ...13

*Cephalon, Inc. v. Abraxis Bioscience, LLC*,
  618 Fed. Appx. 663 (Fed. Cir. 2015) ............................................................ 11

*Centricut, LLC v. Esab Group, Inc.*,
  390 F.3d 1361, 1369-70 (Fed. Cir. 2004) ........................................................ 22

*Dawn Equip. Co. v. Kentucky Farms, Inc.*,
  140 F.3d 1009, 1016 (Fed. Cir. 1998) ............................................................ 11

*Dolly, Inc. v. Spalding & Evenflo Cos.*,
  16 F.3d 394, 398, 29 USPQ2d 1767, 1770 (Fed.Cir.1994) ......................... 17,18

*E-Pass Techs., Inc. v. 3Com Corp.*,
  343 F.3d 1364, 1369 (Fed.Cir.2003) ............................................................ 12

*Ethicon Endo-Surgery, Inc. v. United States Surgical Corp.*,
  149 F.3d 1309, 1315 (Fed. Cir. 1998) ............................................................ 11

*Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*,
  339 U.S. 605, 608 (1950) ............................................................................. 17

*Intel Corp. v. Int'l Trade Comm'n*,
  946 F.2d 821, 832, 20 USPQ2d 1161, 1171 (Fed.Cir.1991) ......................... 18

*Markman v. Westview Instruments, Inc.*,
    116 S. Ct. 1384, 1396 (1996) ........................................................................ 16

*Markman v. Westview Instruments, Inc.*,
    52 F.3d 967, 976 (Fed. Cir. 1995)(en banc), aff'd, 517 U.S. 370 (1996) ......... 16

*Pennwalt Corp. v. Durand-Wayland, Inc.*,
    833 F.2d 931, 969 (Fed. Cir. 1987) .............................................................. 18

*Richardson v. Suzuki Motor Co., Ltd.*,
    868 F.2d 1226, 1239-1240, 9 USPQ2d 1913, 1923 (Fed.Cir.1989) ............... 18

*Specialty Equipment & Mach. Corp. v. Zell Motor Car Co.*,
    193 F.2d 515, 518, 92 U.S.P.Q. (BNA) 84, 87 (4th Cir. 1952) .................... 18

*SRI Int'l v. Matsushita Elec. Corp.*,
    775 F.2d 1107, 1121 (Fed. Cir. 1985) .................................................... ...13

*Tandon Corp. V. United States Int'l Trade Comm'n*,
    831 F.2d 1017, 1023 (Fed. Cir. 1987) ........................................................13

*Tex. Digital Sys., Inc. v. Telegenix, Inc.*,
    308 F.3d 1193, 1204-05 (Fed. Cir.2002) ........................................................ 12

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
    135 S. Ct. 831, 841-42 (2015) ........................................................................ 11

*Union Carbide Corp. v. Am. Can Co.*,
    724 F.2d 1567, 1573 (Fed. Cir. 1984) ........................................................... 22

*Valmont Indus., Inc. v. Reinke Mfg. Co., Inc.*,
    983 F.2d 1039, 1043 (Fed. Cir. 1993) ......................................................... 17

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576, 1582 (Fed.Cir.1996) .............................................................. 12

## STATUTES

35 U.S.C. § 271 ...........................................................................................3

## OTHER AUTHORITY

*Chisum On Patents*, Vol. 5A , Sec. 18.04[1][b][iii](2005) .................................. ....17

*Lipscomb's Walker on Patents*, 3rd Edition, Vol. 6, Sec. 22.32 ((1987) ...............17

## STATEMENT OF RELATED CASES

(A)  No other appeal in or from the same civil action or proceeding in the lower court or body was previously before this or any other appellate court.

(B)  *Coconut Grove Pads, Inc. v. Mich & Mich TGR Inc.*, 2:15-cv-02158 (KAM)(GRB), is pending before the Eastern District of New York, and relates to the same patent, and a similar accused device, and it is expected that the outcome of the above noted case will be directly affected by this court's decision in the pending appeal.

## JURISDICTIONAL STATEMENT

A.  This appeal involves asserted violations of 35 U.S.C. § 271 et seq.  The district court had jurisdiction of the claim below under 28 U.S.C. §§ 1331(a) and 1338(a.)

B.  This Court of Appeals has jurisdiction under 28 U.S.C. § 1292(c)(2) inasmuch as this is an appeal from a final decision of the United States District Court for the Eastern District of New York regarding patent infringement, entered September 4, 2015. A timely notice of Appeal was filed on October 2, 2015.

## ISSUES PRESENTED FOR REVIEW

Appellant Mich & Mich TGR Inc. ("Mich & Mich") respectfully submits the following issues to be raised on appeal:

1.     Whether the District Court erred in its claim construction as a matter of law by adding the limitation that the "elongated member" of method Claim 12 of United States Patent Number  RE 43,766 (the " '766 patent") must be the "main portion" of the apparatus based on the use of the term "elongate main portion" in the prior apparatus claims and specification.

2.     Whether the District Court erred in construing independent method Claim 12  of the '766 patent to require that the "elongated member" "extends continuously across the opposite ends of the apparatus," incorporating the limitations added by applicant in method Claims 13 and 15 depending from Claim 12.

3.     Whether, in light of the erroneous claim construction, the District Court erred by granting summary judgment of literal non-infringement of the process of Claim 12 of United States Patent Number  RE 43,766.

4.     Whether, even if the Claim 12 is construed to require an elongated member that extends continuously across the apparatus, the District Court erred by granting summary judgment of non-infringement of Claim 12 under the doctrine of equivalents.

## STATEMENT OF THE CASE

Michelle Ostaseski, the inventor of the patent involved in this appeal, developed a remarkable, yet simple solution for bringing the bra-straps of a bra closer together on the back of the wearer of a bra.  Though simple in construction and concept, the bra strap retainer of the invention was the first of its kind.  Ms. Ostaseski was granted United States Patent Number 7,278,900 and subsequently, United States Patent Number RE 43,766, adding the method claims 12 through 15. (*A103*) (hereinafter "the '766 patent" or "the patent in suit")  On Dec. 26, 2013, all rights in the '766 patent, including rights for enforcement of all past infringements, were exclusively assigned to Mich & Mich, TGR Inc (hereinafter "Mich & Mich").

Plaintiff Mich & Mich, as owner of the '766 patent, brought this action against Defendant, Brazabra Corporation (hereinafter "Brazabra") on October 1, 2014 seeking a permanent injunction, damages and/or a reasonable royalty, and costs pursuant to the Patent Laws of the United States, 35 U.S.C. § 271(*A7*).

Brazabra moved for summary judgment of non-infringement of all claims of the '766 patent.  The district court issued its decisions and order granting summary judgment of non-infringement on September 4, 2015 (*A20*), resulting in the Final Judgment issued by the Clerk on September 4, 2015 in favor of Brazabra closing the case (*A101*).

## STATEMENT OF THE FACTS

### I.    United States Patent Number RE43,766

The apparatus and method disclosed and claimed in the '766 patent are the first of its kind to offer a single unitary device that could secure the opposing straps of a brassiere ("bra") effectively together on the back of a user, and yet lie in a single plane so the profile of the retaining member beneath the garments of the wearer is minimized.  See col. 3, line 66 of the '766 patent through line 2 of col. 4.  (*A108*).  The bra strap retainer of the invention is thus less noticeable, and more comfortable than the known devices in the prior art, while fully concealing the bra straps.

An illustration from the '766 patent showing one embodiment of a bra strap retainer in use holding two bra straps together on a wearer's back is shown immediately below (*A105*, Fig. 2):



The bra strap retainer 10 is positioned on the back of a person wearing a bra, and keeps the bra straps 22 and 23 together on the back of the wear, and as illustrated

includes an elongate member 11 extending between strap retaining members 12 and 13.  The straps of a brassier are placed between the slots formed by curved elements 14 through 17 and the elongate member 11 to hold them in place.

Prior devices had multiple parts, or were not flat, unitary pieces in a single plane, which made them more expensive to produce, and less desirable inasmuch as they were bulky and difficult to conceal beneath a blouse.

The reissue patent added the method claims, Claims 12 through 15, the claims at issue.

## II.    The Language of the Claims at Issue

The issue on appeal focuses on the method claims of the '766 patent recited below, wherein Claim 12 recites providing a bra strap retainer comprising an "elongated member *extending between* the strap-retaining members," claim 13 depending from claim 12 further defines the strap-retaining members positioned at opposite ends of the elongated member and dependant claim 15 depends from claim 13 and adds the limitation that said "elongated member *extends across the bra strap retainer from opposite ends* of the bra strap retainer." (emphasis in italics added).

The full text of claims of the '766 patent at issue in this appeal is:

Claim 12:    A method of preventing the slippage of bra straps off of the shoulders of a person wearing a bra, comprising:

-5-

providing a bra strap retainer comprising at least a pair of strap-retaining members positioned at opposite ends of the retainer, respectively, and an elongated member extending between the strap-retaining members;

positioning the bra strap retainer in the back region of the person, between the straps of a bra being worn by the person;

placing a first bra strap into a retained position by placing the strap in a first pair of slots located between the strap-retaining members and the elongated member; and

placing a second bra strap into a retained position by placing the strap in a second pair of slots located between the strap-retaining members and the elongated member;

wherein the bra strap retainer brings the first and second straps in close proximity with each other in a location on the person 's back, thereby preventing the straps from

slipping of the person 's shoulder.

Claim 13:  The method of claim 12, wherein the bra strap retainer comprises strap-retaining members positioned at opposite ends of the elongated member.

Claim 15:  The method of claim 13, wherein the elongated member extends across the bra strap retainer from opposite ends of the bra strap retainer.

### III.    The Claim Construction of the District Court

The District Court in its Claim Construction of Claim 12 (see *A50*) defined "elongated member" as "*a main structure that is longer than it is wide, and that extends continuously across the opposite ends of the apparatus without a substantial break or gap*," thereby incorporating the limitations added by applicant by independent Claims 13 and 15 into Claim 12, as well as the requirement that the elongated member be the "main structure" of the apparatus.

The District Court's holding of Non-Infringement of Claim 12 was based solely on the claim construction of the term "elongated member," requiring a continuous main structure. (*A63-64*)

### IV.    The Accused Device of Appellant Brazabra

A.    The Bra Converting Clip of Brazabra ("the accused device") is illustrated by the following copies of the packaging of the accused device. (*A276*; *A315*).




B.    The Accused Device of Brazabra, as noted in the packaging above

instruct the user in the practice of all elements of the process of Claim 12, as shown

in the Claim Chart below with reference to the accompanying annotated image of the

Brazabra clip. (*A266 and A270-271*).



Claim Chart illustrating each element of Claim 12 of the '766 patent:

| A method of preventing the slippage of bra straps off of the shoulders of a person wearing a bra, comprising: | The above illustrated packaging for the Brazabra clip illustrates  the product to keep bra straps from slipping |
|---|---|
| providing a bra strap retainer comprising | the Brazabra Clip is a bra strap retainer |
| at least a pair of strap-retaining members positioned at opposite ends of the retainer, respectively, and | strap-retaining members, pairs C and D, and pair E and F, are positioned at opposite ends of the retainer |
| an elongated member extending between the strap-retaining members; | element A is elongated, though split, and extends between retaining members C/D, and E/F |

| | |
|---|---|
| positioning the bra strap retainer in the back region of the person, between the straps of a bra being worn by the person; | the packaging for the Brazabra Clip shows the clip in the back region of the person, between the straps of a bra being worn by the person |
| placing a first bra strap into a retained position by placing the strap in a first pair of slots located between the strap-retaining members and the elongated member; and | the packaging for the Brazabra Clip shows inserting bra straps into the slots formed between elongate member (A) and the respective retaining members (C/D and E/F) |
| placing a second bra strap into a retained position by placing the strap in a second pair of slots located between the strap-retaining members and the elongated member; | the packaging for the Brazabra Clip shows inserting bra straps into the slots formed in the retainer between the Elongate member ; |
| wherein the bra strap retainer brings the first and second straps in close proximity with each other in a location on the person's back, thereby preventing the straps from slipping off the person's shoulder | The packaging for the Brazabra Clip shows the bra strap retainer brings the bra straps in close proximity with each other in a location on the person's back, thereby preventing the straps from slipping off the person's shoulder |

## SUMMARY OF ARGUMENT

The District Court improperly construed a key element of Claim 12 of the patent in suit, thus making the analysis of infringement, literal or under the doctrine of equivalents, erroneous. In construing Claim 12, the District Court imported limitations from the specification and the dependent Claim 15 to construe the meaning of the term "elongated member" as used in Claim 12 of the '766 patent.

In particular, the District Court imported two crucial limitations into Claim 12.

First, the District Court added the requirement that the elongated member be the "main structure" of the apparatus used in the process of Claim 12, despite applicant clearly omitting any indication that the elongated member was the "main" or in any way a more important feature of the process or apparatus of Claim 12.  Second, the District Court imported the limitation requiring that the elongated member "extends continuously across the opposite ends of the apparatus," incorporating the limitations of dependent Claims 13 and 15 into independent Claim 12, thereby violating the doctrine of claim differentiation, and rendering Claims 13 and 15 meaningless.

The lack of an elongated "main" member extending continuously across the accused device was the sole basis for the holding below of non-infringement of Claim 12, and it is respectfully submitted that the above noted improperly imported limitations from dependent claims necessitate a reevaluation of the infringement analysis.

The District Court also did not consider the evidence presented for infringement under the doctrine of equivalents by holding the expert testimony had not been presented, despite holding correctly the structural simplicity of the patented and accused devices; and improperly held the asserted equivalency ensnared the prior art.

## ARGUMENT

### I.     Standard of Review

The District Court's summary judgment holdings on the claim construction and literal non-infringement are subject to the *de novo* standard of review, with the underlying facts being subject to review for clear error.  See *Cephalon, Inc. v. Abraxis Bioscience, LLC*, 618 Fed. Appx. 663 (Fed. Cir. 2015)(citing *Teva Pharms. USA, Inc. v. Sandoz, Inc*., 135 S. Ct. 831, 841-42 (2015).

The District Court's summary judgment holdings regarding the doctrine of equivalents included clear errors of law, and are thus subject to the *de novo* standard of review. See e.g. *Ethicon Endo-Surgery, Inc. v. United States Surgical Corp*., 149 F.3d 1309, 1315 (Fed. Cir. 1998); *Dawn Equip. Co. v. Kentucky Farms, Inc*., 140 F.3d 1009, 1016 (Fed. Cir. 1998).

### II.     Claim Construction of the term "elongated member" in Claim 12

A.     The District Court incorrectly added the limitation that the "elongated member" of Claim 12 must be the "main structure" of the apparatus based on the use of the term "elongate main portion" in the specification, and prior apparatus claims.

Claim 12 describes a method for preventing slippage of bra straps off of the shoulders of a person wearing a bra, by securing the opposing bra straps together on the back region of the person wearing a bra by recited steps in conjunction with an

apparatus having an "elongated member" and "retaining members." Claim 12 does not at any point use language to suggest or identify that one feature is more important or the "main" feature of the process. Though in the preferred embodiment of the apparatus shown in the specification, the elongated central portion 11 is describes as an "elongated main portion," and the term "main elongated member" is used in the apparatus claims of the patent, it is incorrect to read this limitation of "main" into Claim 12, which deliberately left out the terms "main" or "central" from its language. A court should "[f]irst ... look to the words of the claims themselves, *both asserted and nonasserted*, to define the scope of the patented invention." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed.Cir.1996) (citations omitted)(emphasis added).

Importantly, the District Court, when importing the term "main portion" into the language of Claim 12, gave no significance to the fact that the applicant did not assert the term "main portion" in Claim 12. *E-Pass Techs., Inc. v. 3Com Corp.*, 343 F.3d 1364, 1369 (Fed.Cir.2003); see also *accord Tex. Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1204-05 (Fed. Cir.2002). The court imported the term "main portion" from its use in some parts of the specification and prior claims, despite the term "main portion" being conspicuously left out of Claim 12. When construing a claim, courts are to interpret claims "in view of the specification" without unnecessarily importing

limitations from the specification into the claims.  *Supra*.

Accordingly, it is respectfully submitted that the court erred in importing the requirement that the elongated member of Claim 12 must be the "main portion" of the apparatus.  The court below based its holding of non-infringement of Claim 12, in part, on the fact that the "center pieces of the accused device (the portion of the accused device asserted by Mich & Mich to be the elongated member) was not the main portion of the accused device.[1]

> B.    The definition of the elongated member of Claim 12  provided by the District Court would render Claims 13 and 15 meaningless in violation of  the doctrine of claim differentiation.

The District Court incorrectly ignored the difference in scope in Claim 12, and dependent Claims 13 and 15, and instead included the limitations of Claims 13 and 15 into its claim construction of the term elongated member in Claim 12, thereby rendering dependent Claims 13 and 15 superfluous and meaningless.[2]

---

[1]See the *District Court's September 4, 2015 Memorandum and Order* (hereinafter "*The Decision*"), page 45 (A64).

[2]"...there is presumed to be a difference in meaning and scope when different words or phrases are used in separate claims. To the extent that the absence of such difference in meaning and scope would make a claim superfluous, the doctrine of claim differentiation states the presumption that the difference between claims is significant." *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985)(citing *Tandon Corp. v. United States Int'l Trade Comm'n*, 831 F.2d 1017, 1023 (Fed. Cir. 1987)). As noted in *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir.2006,) another important rule of claim construction is

The relevant portion of Claim 12 provides "a bra strap retainer comprising at least a pair of strap-retaining members positioned at opposite ends of the retainer, respectively, and an elongated member extending between the strap-retaining members." (*A109*). If the definition for elongated member as construed by the District Court, "a main structure that is longer than it is wide, and that extends continuously across the opposite ends of the apparatus without a substantial break or gap," is inserted into Claim 12, the above portion reads as follows[3]:

> a bra strap retainer comprising at least a pair of strap-retaining members positioned at opposite ends of the retainer, respectively, and *a main structure that is longer than it is wide, and that extends continuously across the opposite ends of the apparatus without a substantial break or gap*, extending between the strap-retaining members.[4]

Claim 13 depends from Claim 12 and further requires "strap-retaining members positioned at opposite ends of the elongated member." And Claim 15, in turn depends from Claim 13, requiring "the elongated member extends across the bra strap retainer from opposite ends of the bra strap retainer." (*A109*)

---

that no term in a claim is superfluous. As the Bicon court noted "we construe claims to give effect to all of their terms." *Id*.

[3] See *The Decision*, page 31. (*A50*)

[4] It is noted that "the retainer" or "bra strap retainer" are the terms used in Claims 12-15 to define the apparatus as a whole, and are interchangeable with the District Court's term "apparatus."

If, as the District Court's definition requires, the elongated member of Claim 12 "extends continuously across the opposite ends of the apparatus," Claims 15 simply restates an already existing limitation of Claim 12, and has absolutely no purpose in the patent.

Further, the District Court's definition would also render Claim13 meaningless. Claim 13 requires that the strap-retaining members are "positioned at opposite ends of the retainer." The District Court's interpretation requires that the elongated member of Claim 12 "extends continuously across the opposite ends of the [retainer]."  By definition, if the strap retaining members are located "at opposite ends of the retainer" and the elongated member also "extends across opposite ends of the [retainer]," the strap-retaining members would have to be positioned at opposite ends of the elongated member, rendering Claim 13 meaningless and superfluous.

Accordingly, it respectfully submitted that the court below erred as a matter of law in importing the requirements of Claims 13 and 15 into Claim 12.  Such a restrictively limited definition of the elongated member of Claim 12 was central to the District Court holding of literal non-infringement of Claim 12, and a less restrictive definition would certainly require re-analysis of the finding of non-infringement.[5]

---

[5] See *The Decision*, page 44-45 (*A63-64*)

## III.   Literal Infringement of Claim 12

The Claim Chart, along with the images of the accused device and its packaging, on pages 7 and 8 above details how the elements of Claim 12 of the '766 patent can be found in the accused Brazabra Clip; and is incorporated herein for the Court's consideration.

The legal scope of a patent claim to be determined by construction of the terms of a claim is a question of law.[6] However, infringement of a properly construed claim is a question of fact, not law, and the trier of fact must compare the properly construed claim to the accused design to determine whether there has been infringement.[7]

It is respectfully submitted that the accused device of Brazabra literally infringes the process of Claim 12, or in the very least, it was improper for the court below to determine a trier of fact could not find literal infringement when the evidence is viewed in a light most favorable to Mich & Mich, the party opposing the summary judgement motion that was before the District Court.

## IV.   Infringement of Claim 12 Under the Doctrine of Equivalents

Even if Claim 12 is construed such that the elongated member of Claim 12

---

[6] *Markman v. Westview Instruments, Inc.*, 116 S. Ct. 1384, 1396 (1996.)

[7] *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995)(en banc), aff'd, 517 U.S. 370 (1996)

requires a continuous member that extends from one end of the apparatus to the other, it is respectfully submitted that the doctrine of equivalents would still enable a possible finding of infringement by the trier of fact, and that the accused device "performs substantially the same function in substantially the same way to obtain the same results."[8] Thus, summary judgment of non-infringement under the doctrine of equivalents was inappropriate. By simply providing a small gap in the elongated member of the accused device Brazabra has made an attempt at "evading patent claims with insubstantial changes," *Valmont Indus., Inc. v. Reinke Mfg. Co., Inc*., 983 F.2d 1039, 1043 (Fed. Cir. 1993). The changes "add[ed] nothing" to the functionality of the apparatus and process; Brazabra merely attempted "to take the copied matter outside the claim."[9]

The Brazabra Clip has an elongated member, though split; and as well established, two components of an accused device may properly be considered to infringe a single claim element when the two components must operate in substantially the same way to achieve the same result.[10]

---

[8] Graver Tank & Mfg. Co. v. Linde Air Prods. Co., 339 U.S. 605, 608 (1950.)

[9] *Graver Tank* , 339 U.S.at 607.

[10] *Lipscomb's Walker on Patents*, 3rd Edition, Vol. 6, Sec. 22.32 ((1987); *Chisum On Patents*, Vol. 5A , Sec. 18.04[1][b][iii](2005). See, also *Dolly, Inc. v.*

-17-

Further, by splitting the elongated member, and having the exterior retaining members join together to form a unitary element, the accused device merely results in a reversal of parts; the elongate main portion being split with the retaining member elements being a unitary structure along the periphery, instead of the elongated member being a unitary structure and the retaining members being separated along the periphery, as shown in the '766 patent.

A bra strap retainer requires a unitary element (to maintain the retainer as a single piece), and a split element (to allow entry of the strap into the "gaps" of the retainer). It is insignificant to the function of the process whether the elongated member is split or the exterior retaining embers are spilt, either configuration works, and both perform the same function of securing bra straps together on a wearer's back, in order to achieve the same result of preventing them from slippage, in the same way

---

*Spalding & Evenflo Cos*., 16 F.3d 394, 398, 29 USPQ2d 1767, 1770 (Fed.Cir.1994) ("An accused device may infringe under the doctrine of equivalents even though a combination of its components performs a function performed by a single element in the patented invention.") (citing *Intel Corp. v. Int'l Trade Comm'n*, 946 F.2d 821, 832, 20 USPQ2d 1161, 1171 (Fed.Cir.1991)); see also *Richardson v. Suzuki Motor Co., Ltd.*, 868 F.2d 1226, 1239-1240, 9 USPQ2d 1913, 1923 (Fed.Cir.1989); *Pennwalt Corp. v. Durand-Wayland, Inc.*, 833 F.2d 931, 969 (Fed. Cir. 1987) ("Neither the joinder of different elements of a patented combination into one, nor the separation of one integral part into two or more doing together substantially what was done by the single element will evade a charge of infringement" (quoting *Specialty Equipment & Mach. Corp. v. Zell Motor Car Co.*, 193 F.2d 515, 518, 92 U.S.P.Q. (BNA) 84, 87 (4th Cir. 1952)

by securing each opposing bra strap in the respective gaps created by the strap-retaining members positioned at opposite ends of an elongated member.

The court below held, correctly, the patented and accused devices had structural simplicity.[11]  And the court below had been provided with prior patents showing devices for adjustment of the length of a single brassiere strap exist in alternate formations similar to that of the patented device and the accused device[12]  Yet, the court despite the simplicity of the devices and the acknowledgment that devices to adjust the length of a single bra strap had structures comparable to those of the patented and accused device, would not permit the matter to go to the trier of fact.

Appellant had provided in *Plaintiff's Statement of Facts,* that U. S. Patent no. 2,278,153 and U. S. Patent no. 1,769,753[13] disclose a structure very similar to the structure of the device patented in the '766 patent, and European Patent EP1051926A1 to Fildan discloses a structure very similar to the structure of the accused device.  It was noted that  these devices are designed to be used to adjust the length of a single bra strap and do not disclose how to secure two bra straps together on a user's back. However, their respective structures do establish that they are known equivalents in

---

[11] See *The Decision*, page 59. (*A78*)

[12] See *The Decision*, page 63. (*A82*)

[13] See Appendix A262-263

the technical field of retainers for use with the straps of a brassiere.

Appellant had provided to the court below in paragraph 3 of *Plaintiff's Statement of Facts*, "U. S. Patent no. 2,278,153 was cited by the Patent Office Examiner during the examination of the '766 patent discloses the structure of the patented device used as an adjustable buckle for a single bra strap, and common structures for a buckle for a single bra strap do not establish the invention for a retainer for securing both straps of a bra in proximity on a user's back is unpatentable." [14]

U. S. Patent no. 2,278,153 to Shaulson was cited by the Patent Office Examiner during the examination of the application that led to the initial '900 patent and the later reissue patent '766. The Shaulson patent, like the Fildan reference, relates to a lingerie buckle for shortening or lengthening a bra strap and maintaining it in the selected length.    The Shaulson patent states:

> With the above described construction and operation, the conventional idler loop buckle is unnecessary and it is not necessary to slide the buckle up and down in order to lengthen or shorten the lingerie strap. By merely winding the buckle in a fixed position the strap may be adjusted.
> Page 2, lines 5-11 of the Shaulson patent.

Fig. 6 of the Shaulson patent is reproduced below and illustrates that common

---

[14] Appendix A263

structures for a lingerie buckle to secure the length of a single bra strap does not render unpatentable the invention of the '766 patent for a retainer for securing both straps of a bra in proximity on a user's back.  Fig 6 of the Shaulson patent:



U. S. Patent no. 1,769,753 similarly to U. S. Patent no. 2,278,153  discloses the structure of the patented device used as an adjustable buckle for a single bra strap, and in Fig. 4 discloses structures for a buckle for a single bra strap common with the structures of the invention patented in the '766 patent, and is shown below:



European Patent EP1051926A1 to Fildan[15] shown on the following page illustrates a buckle for a single bra strap similar in geometry to that of the accused product of Appellee, although, again, for adjusting the length of a single bra strap.

---

[15]  See Appendix A211



The court below would not accept these facts by asserting particularized testimony and limitation by limitation basis had not been provided by expert testimony.[16]    However, the simple structures were easily understood and expert testimony was not needed to establish facts that should have been presented to the jury regarding infringement under the doctrine of equivalents.    *AquaTex Indus. v. Techniche Solutions*, 479 F.3d 1320, 1327-28 (Fed. Cir. 2007).  Note 7 of *AquaTex Indus* however, clearly states that expert testimony is only in needed in complex cases, stating "Even where literal infringement is involved, expert infringement testimony is generally required in cases involving complex technology."  See *Centricut, LLC v. Esab Group*, Inc., 390 F.3d 1361, 1369-70 (Fed. Cir. 2004).  *Centricut, LLC v. Esab Group,*  goes on to say:

> In many patent cases expert testimony will not be necessary because the technology will be "easily understandable without the need for expert explanatory testimony." *Id*. At 1369 (citing *Union Carbide Corp. v. Am. Can Co.*, 724 F.2d 1567, 1573 (Fed. Cir. 1984); *Bernhardt, L.L.C. v. Collezione Europa USA, Inc*., 386 F.3d 1371, 1384 (Fed. Cir. 2004)).

---

[16] See *The Decision*, pages 71- 73. (*A90-92*)

The court below improperly denied the question of infringement under the doctrine of equivalents to proceed to trial by requiring the declarations and evidence required of complex cases in this rather simple structural matter.

Appellant had demonstrated the interchangeability of the basic structures of the accused device and the patented device; and the trier of fact should not have been deprived of examining this evidence after trial.  Infringement under the doctrine of equivalents should have properly been allowed to go to trial.

## V.  Court Below Improperly Found the Defense of Ensnarement

The court below found the defense of ensnarement precluded a reliance upon the doctrine of equivalents.  The court held construing the claims to encompass the accused device would ensnare the prior art of a European Fildan patent application for a bra strap slider or retainer that contains a single bra strap that slides vertically to tighten or loosen a bra strap.[17]

As the court noted, the Fildan reference relates to a brassiere strap slide; and cannot in any way "ensnare" any equivalent construction of Claim 12.

Claim 12 of the asserted '766 reissue patent recites in part:

> A method of preventing the slippage of bra *straps off of the shoulders of a person wearing a bra*, comprising: providing a bra strap retainer comprising at least a pair of strap-retaining members positioned

---

[17] See *The Decision*, page 74- 73. (*A93*)

at opposite ends of the retainer, respectively ... *positioning the bra strap retainer in the back region of the person, between the straps of a bra being worn by the person*; *placing a first bra strap* into a retained position by placing the strap in a first pair of slots located between the strap-retaining members and the elongated member; and *placing a second bra strap* into a retained position by placing the strap in a second pair of slots located between the strap-retaining members and the elongated member; *wherein the bra strap retainer brings the first and second straps in close proximity with each other in a location on the person's back, thereby preventing the straps from slipping off the person's shoulder.* (Emphasis added.)

Assuredly, the Fiden reference is not 'ensnared" in any interpretation of claim

12.  The Fiden reference does not disclose:

- A method of preventing the slippage of bra straps off of the shoulders of a person wearing a bra
- positioning the bra strap retainer in the back region of the person, between the straps of a bra being worn by the person;
- placing a first bra strap into a retained position by placing the strap in a first pair of slots located between the strap-retaining members and the elongated member
- placing a second bra strap into a retained position by placing the strap in a second pair of slots located between the strap-retaining members and the elongated member
- wherein the bra strap retainer brings the first and second straps in close proximity with each other in a location on the person's back, thereby preventing the straps from slipping off the person's shoulder.    .

The doctrine of equivalents may certainly be applied to claim 12, and the matter

should have been allowed to go to the trier of fact.

## VI.    Conclusion

Claim 12 of The '766 patent covers a method which for the first time in the patent literature discloses a unitary device that provides a method to simply and securely hold the two straps of a bra in proximity on a user's back; and Defendant Brazabra has appropriated the invention of the '766 patent. In a nutshell, Brazabra has taken, and substantially profited from, what Michelle Ostaseski created and patented in her '766 patent.

The District Court improperly construed Claim 12 of the '766 patent and based its finding of non-infringement on its improper Claim Construction. In the very least, substantial issues of fact remain at issue in order to determine if the accused device of Brazbra infringes Claim 12 of the '766 patent, and the District Court's finding of non-infringement on summary judgment was not appropriate.

## VII.   Statement of Relief Sought

Mich & Mich requests that this court vacate the courts ruling on summary judgment that the method claim 12 is not infringed by a faulty claim construction and wrongful application of law concerning the doctrine of equivalents.

New York, NY
Dated: December 8, 2015                    Respectfully submitted,


                                            /s/ Gerard F. Dunne
                                            Gerard F. Dunne
                                            Attorney for Appellant
                                            41 Union Square West, Suite 1125
                                            New York, NY 10003
                                            (212) 645-2410
                                            Jerry.dunne@dunnelaw.net

ADDENDUM A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------X

MICH & MICH TGR, INC.,                          JUDGMENT

                              Plaintiff,        14-CV- 5758 (KAM)

        -against-

BRAZABRA,    CORP.,

                              Defendant.
----------------------------------------------------X

        A Memorandum and Order of Honorable Kiyo A. Matsumoto, United States

District Judge, having been filed on September 4, 2015, finding that the accused product does not

infringe the patent-in-suit, either literally or under a theory of the doctrine of equivalents;

granting Defendant's motion for summary judgment; and directing the Clerk of Court to enter

judgment in favor of Defendant and to close the case; it is

              ORDERED and ADJUDGED that Defendant's motion for summary judgment is

granted; and that judgment is hereby entered in favor of Defendant Brazabra, Corp., and against

Plaintiff Mich & Mich TGR, Inc.

Dated: Brooklyn, New York                       Douglas C. Palmer
        September 04, 2015                       Clerk of Court

                                         by:    /s/ Janet Hamilton
                                                Deputy Clerk

ADDENDUM B

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------- x
MICH & MICH TGR, INC.,                 :
                                       :
                   Plaintiff,          :
                                       :
     -against-                         : **MEMORANDUM AND ORDER**
                                       :
                                       : No. 14 Civ. 5758 (KAM)(AKT)
BRAZABRA, CORP.,                       :
                                       :
                   Defendant.          :
-------------------------------------- x
**MATSUMOTO, United States District Judge:**

          Mich & Mich TGR, Inc. ("plaintiff") commenced this

action alleging that defendant Brazabra, Corp. ("defendant" or

"Brazabra") are infringing upon plaintiff's "Bra Strap

Retainer," U.S. Reissue Patent No. 43,766 by, *inter alia*,

knowingly and willingly importing into the United States,

selling, and causing to be sold, and offering for sale within

this judicial district and elsewhere, retainers for brassiere

straps that infringe upon plaintiff's patents without

plaintiff's permission or authorization. (ECF No. 1, Complaint

("Compl.") ¶¶ 8-11, dated October 1, 2014.)[1] Plaintiff seeks

injunctive relief requiring defendant and its agents to cease

production, advertising and sale of the alleged infringing

product, as well as destruction of all products infringing upon

---

[1] Plaintiff filed an initial complaint on May 11, 2014, which plaintiff
voluntarily dismissed on October 1, 2014 due to a defect in subject matter
jurisdiction in that the wrong plaintiff was named. (Case No. 14-CV-2974.)
On October 1, 2014, plaintiff refiled its complaint under the same caption,
changing only the named plaintiff.

plaintiff's patents. (Compl. ¶ B.) Plaintiff also seeks an accounting of defendant's profits from the sale and resale of the allegedly infringing product, in order that plaintiff may be compensated, as well as attorney's fees and costs, and treble damages. (Compl. ¶¶ C-F.)

Presently before this court is defendant's motion for summary judgment to dismiss all of plaintiff's claims pursuant to Federal Rule of Civil Procedure ("Rule") 56, and plaintiff's opposition thereto. (ECF No. 11, Defendant's Motion for Summary Judgment and Statement of Material Facts Pursuant to Rule 56.1 ("Mot. and Rule 56.1 Stmt."); ECF No. 12, Defendant's Memorandum in Support of Motion for Summary Judgment ("Def. Mem."); ECF No 13, Declaration of Theodore Davis in Support of Motion for Summary Judgment ("Davis Decl."; ECF No. 14, Declaration of Scott Spencer in Support of Defendant's Motion for Summary Judgment ("Spencer Decl."); ECF No. 15, Plaintiff's Opposition to Defendant's Motion for Summary Judgment ("Pl. Opp."), Plaintiff's Rule 56.1 Statement ("Pl. 56.1 Stmt."), Plaintiff's Supplemental Claim Construction ("Pl. Claim Constr."), Declaration of Joseph Dunne in Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment ("Dunne Decl."); ECF No. 16, Defendant's Reply in Support of Its Motion for Summary Judgment ("Def. Reply"); Reply Declaration of Scott Spencer in Support of Defendant's Motion for Summary Judgment ("Spencer

Reply Decl."); ECF 23, Defendant's Supplemental Letter re New Caselaw dated February 18, 2015("Def. Ltr."); Oral Argument Transcript dated February 12, 2015 ("Oral Arg. Tr.").)

Defendant contends that its product does not literally infringe the '766 patent, that plaintiff is estopped from alleging a theory of infringement under the doctrine of equivalents and, in any event, any claim of equivalence is meritless.  Upon consideration of the parties' submissions and oral argument, for the reasons set forth below, defendant's motion for summary judgment of non-infringement is granted.

<u>**BACKGROUND**</u>

Plaintiff is the owner by assignment of the U.S. Reissue ("RE") Patent No. 43,766 for a Bra Strap Retainer (the "'766 patent"), issued on October 23, 2012.  The '766 patent, or the patent-in-suit, describes an invention wherein a "new bra strap retainer [is used] for preventing the straps from falling from the user's shoulder."  (Compl. Ex. A, Col. 1.)  The device "includes a retaining member having an elongate main portion and opposite end portions which are adapted to keep straps of a bra on a user's back in proximate relationship to one another." (*Id.*, Col. 2.)  The '766 patent describes a device that "essentially pulls the [bra] straps on the user's back together" and provides an "easy and convenient [method] to wind the straps

disposed upon the user's back through the bra strap retainer."
(*Id.*, Col. 3)

The '766 patent is a reissue of U.S. Patent
Application 12/575,600, (Spencer Decl. Ex. B, the "'600 Reissue
Application"), which the original patent applicant had filed to
obtain additional claims for U.S. Patent No. 7,278,900 (the
"'900 patent") issued on October 9, 2007.  The original '900
patent was issued from Application 11/087,929. (Spencer Decl.
Ex. A, the "'929 Application.")

Plaintiff alleges that defendant Brazabra's product,
titled the "Bra Converter Clip" (the "accused product"), product
ID: S/44021, is infringing upon the '766 patent in violation of
the United States Patent Laws, 35 U.S.C. § 271, et seq., both
literally and under the doctrine of equivalents.  (Pl. Opp. at
1; Declaration of Theodore Davis in Support of Defendant's
Motion for Summary Judgment ("Davis Decl.") ¶ 3.)

Defendant submitted in its Rule 56.1 Statement of
Undisputed Material Fact, *inter alia*, that plaintiff has accused
the Bra Converter Clip, product ID: S/44021 of infringing the
patent-in-suit, and that the accused product appears as depicted
in the Paragraph 3 of the Davis Declaration, samples of which
were provided to plaintiff's counsel as Exhibit A to the Davis
Declaration.  Plaintiff does not dispute defendant's Rule 56.1
Statement, however plaintiff disputes a number of facts alleged

4

by defendant in its memorandum of law in support of its motion for summary judgment. (Pl. Rule 56.1 Stmt. ¶¶ 1-2.) Thus, the parties do not dispute the physical structure of the patented device or the accused device, or their functionality, and only dispute whether the accused product infringes upon plaintiff's device – either literally or under the doctrine of equivalents. "Where . . . the parties do not dispute any relevant facts regarding the accused product [and] disagree over which of [the] possible meanings of [particular claims at issue] is the proper one, the question of literal infringement collapses to one of claim construction and is thus amenable to summary judgment." *Dealertrack, Inc. v. Huber,* 674 F.3d 1315, 1320 (Fed. Cir. 2012) (quoting *Athletic Alternatives Inc. v. Prince Mfg., Inc.,* 73 F.3d 1573, 1578 (Fed. Cir. 1996)); *see also Wireless Ink Corp. v. Facebook, Inc.*, 969 F. Supp. 2d 318, 333 (S.D.N.Y. 2013) *aff'd sub nom. Wireless Ink Corp. v. Google, Inc.*, 570 F. App'x 941 (Fed. Cir. 2014).

The court has considered whether the parties have proffered admissible evidence in support of their statements of fact and has viewed the facts in the light most favorable to plaintiff, the non-moving party. *See Spiegel v. Schulmann,* 604 F.3d 72, 77, 81 (2d Cir. 2010); *Topalian v. Hartford Life Ins. Co.*, 945 F. Supp. 2d 294, 300-01 (E.D.N.Y. 2013).

## I.    Patent Claims at Issue

The claims of a patent are the numbered paragraphs at the end of the patent that define the scope of the invention and thus the scope of the patentee's right to exclude others from making, using, or selling the patented invention.  The terms and phrases within each claim define the scope of each claim.

All patent claims are either independent or dependent. Independent claims stand alone and do not reference any other claim.  Dependent claims, which follow the independent "parent" claims, reference the independent claim and are subsets of the parent claim.  For example, in the patent-in-suit, Claim 2 depends on Claim 1 because it provides: "A bra strap retainer *as described in Claim 1*, wherein said main portion is formed . . ." (Compl. Ex. A, Col. 5.)

The following claims in the patent-in-suit are "independent" and at issue before this court: Claim 1, Claim 6, Claim 8, and Claim 12.[i]  The independent claims contain, *inter alia*, the following key limitations: (1) "an elongate main portion and opposite end portions positioned at opposite ends of said main portion"; (2) a "pair of prongs extending outwardly from opposite sides of said main portion"; (3) a "each of said end portions [of elongate main portion] includes a pair of prongs"; and (4) "each of said prongs having an outer portion

which is essentially disposed parallel to said elongate main

portion." (Compl. Ex. A.)

## DISCUSSION

### I.   Applicable Legal Standards

#### A.   Summary Judgment Standard

The court applies the same summary judgment standards

to patent infringement matters as it does to motions involving

other types of claims.  *CA, Inc. v. Simple.com, Inc.*, 780 F.

Supp. 2d 196, 208 (E.D.N.Y. 2009); *Alloc, Inc. v. Norman D.*

*Lifton Co.*, 653 F. Supp. 2d 469, 473 (S.D.N.Y. 2009); *see Desper*

*Products, Inc. v. QSound Labs, Inc.*, 157 F.3d 1325, 1332 (Fed.

Cir. 1998)*; Becton Dickinson & Co. v. C.R. Bard. Inc.,* 922 F.2d

792, 795-96 (Fed. Cir. 1990).  A court may grant summary

judgment only "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to

any material fact and that the moving party is entitled to a

judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In cases

of patent infringement, summary judgment is proper when no

genuine issue of material fact exists and no expert testimony is

required to explain the nature of the patented invention or the

accused product or to assist in their comparison.  *Amhil*

*Enterprises Ltd. v. Wawa, Inc.*, 81 F.3d 1554, 1557-58 (Fed. Cir.

1996).

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48 (1986) (emphasis in original). "A fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law.'" *Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir. 2005); *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 69 (2d Cir. 2001) (*quoting Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). "An issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Jeffreys*, 426 F.3d at 553. Moreover, no genuine issue of material fact exists "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, . . . or is not significantly probative, . . . summary judgment may be granted." *Anderson,* 477 U.S. at 249–50 (internal citations omitted).

In deciding a motion for summary judgment, the court's function is not to resolve disputed issues of fact, but only to determine whether there is a genuine issue to be tried. *Anderson,* 477 U.S. at 249. The moving party bears the burden of establishing that there is no genuine issue of material fact.

8

*Id.* at 256.  The movant may discharge this burden by demonstrating to the court that there is an absence of evidence to support the non-moving party's case on an issue on which the non-movant has the burden of proof.  *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

"In ruling on a motion for summary judgment, . . . [a court must] view the evidence presented in a light most favorable to the nonmoving party and . . . draw all reasonable inferences in favor of the nonmoving party."  *CA, Inc. v. Simple.com, Inc.*, 780 F. Supp. 2d 196, 209 (E.D.N.Y. 2009) (quoting *C.R. Bard, Inc. v. Advanced Cardio. Sys., Inc.,* 911 F.2d 670, 672 (Fed. Cir. 1990)).  The Second Circuit, however, has explained that "[t]he party against whom summary judgment is sought . . . 'must do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial.'"  *Plew v. Limited Brands, Inc.*, 729 F. Supp. 2d 629 (S.D.N.Y. 2010) *(*quoting *Caldarola v. Calabrese,* 298 F.3d 156, 160 (2d Cir. 2002)) (internal citation omitted); *accord, e.g., Matsushita Elec. Indus. Co., Ltd. V. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).  Nor can the nonmoving party rest only on the pleadings. *Celotex,* 477 U.S. at 324 (stating that Fed. R. Civ. P. 56(e) "requires the nonmoving party to go beyond the pleadings");

*Davis v. New York,* 316 F.3d 93, 100 (2d Cir. 2002). Each statement of material fact by the movant or opponent must be followed by citation to evidence which would be admissible, as required by Fed. R. Civ. P. 56(e) and Local Civil Rule 56.1(d).

Indeed, in the infringement context, declarations offered by the patentee are insufficient to meet the burden of proof of infringement, as are general assertions of facts, general denials, and conclusory statements. *TechSearch, L.L.C. v. Intel Corp.*, 286 F.3d 1360, 1371 (Fed. Cir. 2002). Rather, the "party opposing the motion for summary judgment of noninfringement must point to an evidentiary conflict created on the record, at least by a counter-statement of a fact set forth in detail in an affidavit by a knowledgeable affiant. Mere denials or conclusory statements are insufficient." *TechSearch*, 286 F.3d at 1372 (citing *Collins, Inc. v. N. Telecom, Ltd.,* 216 F.3d 1042, 1046 (Fed. Cir. 2000))

"Summary judgment is as appropriate in patent cases as in other cases when the requirements of Rule 56 of the Federal Rules of Civil Procedure have been met." *Meyers v. Asics Corp.,* 865 F. Supp. 177, 179 (S.D.N.Y. 1994) (citation omitted), *aff'd,* 78 F.3d 605 (Fed. Cir. 1996); *see Amhil Enterprises Ltd. v. Wawa, Inc.*, 81 F.3d 1554, 1557-58 (Fed. Cir. 1996) ("Summary judgment may, however, properly be decided as a matter of law when no genuine issue of material fact exists and no expert

testimony is required to explain the nature of the patented invention or the accused product or to assist in their comparison."). "[I]nfringement is itself a fact issue," *SRI Int. v. Matsushita Elec. Corp. of America,* 775 F.2d 1107, 1116 (Fed. Cir. 1985), therefore courts have repeatedly emphasized that patent claims "are ones in which issues of fact often dominate the scene and summary judgment is allowed only with great caution." *Acrison, Inc. v. Schenck Corp.*, 973 F. Supp. 124, 126 (E.D.N.Y. 1997) (quoting *Garter-Bare Co. v. Munsingwear, Inc.,* 650 F.2d 975, 982 (9th Cir. 1980)); *see also Gaus v. Conair Corp.*, No. 94-CV-5693, 1998 WL 92430, at *2 (S.D.N.Y. Mar. 3, 1998) (citations omitted). Thus, summary judgment on the issue of infringement is proper only when "no reasonable jury could find that every limitation recited in a properly construed claim either is or is not found in the accused device either literally or under the doctrine of equivalents." *Spiel Associates, Inc. v. Gateway Bookbinding Sys., Ltd.*, No. 03-CV-4696, 2010 WL 546746, at *6 (E.D.N.Y. Feb. 16, 2010) (citing *PC Connector Solutions LLC v. SmartDisk Corp.,* 406 F.3d 1359, 1364 (Fed. Cir. 2005)) (internal citation omitted).

When deciding issues in a patent case, a district court applies the law of the circuit in which it sits to nonpatent issues and the law of the Federal Circuit to issues of

substantive patent law.  *Revlon Consumer Products Corp. v. Estee*
*Lauder Companies, Inc.*, No. 00-CV-5960, 2003 WL 21751833, at *7
(S.D.N.Y. July 30, 2003) (citing *In re Cambridge Biotech Corp.,*
186 F.3d 1356, 1368 (Fed. Cir. 1999)); *see also Amana*
*Refrigeration, Inc. v. Quadlux, Inc.,* 172 F.3d 852, 856 (Fed.
Cir. 1999).  The court will also apply the law of the Federal
Circuit to procedural issues that are "intimately involved in
the substance of enforcement of the patent right." *Advanced*
*Cardiovascular Sys., Inc. v. Medtronic, Inc.,* 265 F.3d 1294,
1303 (Fed. Cir. 2001) (the Federal Circuit "appl[ies] the law of
the regional circuit to which the district court appeal normally
lies unless 'the issue pertains to or is unique to patent law,'
in which case [the Federal Circuit] will apply [its] own law to
both substantive and procedural issues 'intimately involved in
the substance of enforcement of the patent right.'"); *Revlon*
*Consumer Products*, 2003 WL 21751833, at *7.

    **B.    Two Step Analysis: Claim Construction Then**
           **Determination of Infringement**

      "A two-step process is used in the analysis of patent
infringement: first, the scope of the claims are determined as a
matter of law, and second, the properly construed claims are
compared to the allegedly infringing device to determine, as a
matter of fact, whether all of the limitations of at least one
claim are present, either literally or by a substantial

equivalent, in the accused device." *Teleflex, Inc. v. Ficosa N. Am. Corp.,* 299 F.3d 1313, 1323 (Fed. Cir. 2002); *Revlon Consumer Products*, 2003 WL 21751833, at *8.

## II. Claim Construction

### A. Applicable Law Regarding Claim Construction

The district court's power to enter summary judgment does not allow it to bypass performing a complete patent infringement analysis. *Grober v. Mako Products, Inc.*, 686 F.3d 1335, 1344 (Fed. Cir. 2012). "[T]he construction of a patent, including terms of art within its claim, is exclusively within the province of the court." *Markman v. Westview Instrs., Inc.,* 517 U.S. 370, 372 (1996). Indeed, claim construction is a question of law, *Cybor Corp.,* 138 F.3d at 1454, and "is the judicial statement of what is and is not covered by the technical terms and other words of the claims." *Netword, LLC v. Centraal Corp.,* 242 F.3d 1347, 1352 (Fed. Cir. 2001); *Aspex Eyewear, Inc. v. Altair Eyewear, Inc.*, 386 F. Supp. 2d 526, 532 (S.D.N.Y. 2005). Thus, before reaching any determination on infringement, the court must construe the patent's claim limitations to define the invention which a patentee has a right to exclude others from practicing, in the absence of the patentee's permission or authorization. *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.,* 381 F.3d 1111, 1115–16 (Fed. Cir. 2004).

Courts are permitted on summary judgment to construe the claims of the patent at issue to determine their meaning and scope, followed by a determination of whether evidence offered raises a triable issue of fact with regard to infringement. *See TecSec, Inc. v. Int'l Bus. Machines Corp.*, 731 F.3d 1336, 1352 (Fed. Cir. 2013) *cert. denied sub nom. Cisco Sys., Inc. v. TecSec, Inc.*, 134 S. Ct. 2698 (2014) (finding that district court's summary judgment opinion followed proper infringement analysis by first construing patent claims and second determining whether the evidence offered by defendant, which compared the claims to the accused products, raised a triable issue of material fact).

A court construing a patent claim seeks to accord a claim the meaning it would have to a "person of ordinary skill in the art at the time of the invention*." Innova/Pure Water,* 381 F.3d at 1116. Indeed, claim terms are entitled to a "heavy presumption" that they carry their "ordinary and customary meaning." *Elbex Video, Ltd. v. Axis Commc'ns, Inc.*, No. 05-CV-3345, 2008 WL 5779782, at *11 (E.D.N.Y. Aug. 19, 2008) (citing *Teleflex,* 299 F.3d at 1325) (internal citation omitted). The claims themselves, the specification and the prosecution history may be used to determine the ordinary meaning of a term, but "in any event the ordinary meaning must be determined from the standpoint of a person of ordinary skill in the relevant art."

*Id.* Thus, the court must determine the meaning of the words in the patent so that the public can be properly placed on notice as to what inventions are and are not covered. *See Pitney Bowes, Inc. v. Hewlett-Packard Co.,* 182 F.3d 1298, 1311 (Fed. Cir. 1999) (discussing the importance of public notice function in claim construction).

"It is well-settled that, in interpreting an asserted claim, the court should look first to the intrinsic evidence of record, *i.e.,* the patent itself, including the claims, the specification and, if in evidence, the prosecution history. Such intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language." *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed. Cir. 1996) (citation omitted); *see Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005); *Rackman v. Microsoft Corp.*, 102 F. Supp. 2d 113, 117 (E.D.N.Y. 2000) (citing *Georgia-Pacific Corp. v. U.S. Gypsum Co.,* 195 F.3d 1322, 1332 (Fed. Cir. 1999)).

First, the court looks to the words of the claims themselves, both asserted and nonasserted, to define the scope of the patented invention. *Vitronics*, 90 F.3d at 1582. The words of the claim itself are the single most important source of the meaning of the claim. *See Eastman Kodak Co. v. Goodyear Tire & Rubber Co.,* 114 F.3d 1547, 1552 (Fed. Cir. 1997), *abrogated on other grounds by Cybor Corp. v. FAS Technologies,*

*Inc.,* 138 F.3d 1448 (Fed. Cir. 1998) (en banc). The claim language is given its ordinary and customary meaning unless a special definition is employed in the specification or prosecution history. *See Vitronics,* 90 F.3d at 1582; *see also Digital Biometrics, Inc. v. Identix, Inc.,* 149 F.3d 1335, 1344 (Fed. Cir. 1998) ("Without an express intent to impart a novel meaning to claim terms, an inventor's claim terms take on their ordinary meaning.") (quoting *York Prods., Inc. v. Central Tractor Farm & Family Ctr.,* 99 F.3d 1568, 1572 (Fed. Cir. 1996)). The ordinary and customary meaning of a claim term is the meaning that "one of skill in the art at the time of the invention would understand [ ]." *Eastman Kodak,* 114 F.3d at 1555 (citing *Intellicall,* 952 F.2d at 1387); *accord Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 986 (Fed. Cir. 1995), *aff'd,* 517 U.S. 370 (1996). "If the claim language is clear on its face, then [the court's] consideration of the rest of the intrinsic evidence is restricted to determining if a deviation from the clear language of the claims is specified." *Interactive Gift Exp., Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001); *see Revlon Consumer Products*, 2003 WL 21751833, at *9.

Next, the court looks to the specification, as "[c]laims must be read in view of the specification, of which they are a part." *Markman,* 52 F.3d at 979. Therefore, a court

must review the specification to determine whether the inventor used any terms in a manner inconsistent with their ordinary meaning.  The specification acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication.  *Vitronics*, 90 F.3d at 1582 (citing *Markman,* 52 F.3d at 979).  Although patent applicants have the flexibility to define claim terms in a manner inconsistent with their ordinary meaning, the special definition of the term must be set out in the specification or file history in a manner sufficient to give one of ordinary skill in the art notice of the change from the ordinary meaning.  *Innova/Pure Water*, 381 F.3d at 1117.

Third, the court may consider the prosecution history of the patent, if it is in evidence.  *Phillips*, 415 F.3d at 1317 (citing *Markman*, 52 F.3d at 980); *Amhil Enterprises*, 81 F.3d t 1559 ("The prosecution history, in addition to being used while considering the factual issue of infringement and whether prosecution history estoppel places any limitations on what infringes a claim, should also be used when considering the legal issue of proper claim construction.").  The prosecution history contains a complete record of all the proceedings before the Patent and Trademark Office, including any express representations made by the applicant regarding the scope of the claims.  As such, the record before the Patent and Trademark

Office is often of critical significance in determining the meaning of the claims. *See Markman,* 52 F.3d at 980; *Southwall Tech., Inc. v. Cardinal IG Co.,* 54 F.3d 1570, 1576 (Fed. Cir. 1995) ("The prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution.") (citations omitted).

Finally, although in most situations, an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term, a court may consider extrinsic evidence if necessary. *Vitronics*, 90 F.3d at 1583. "Extrinsic evidence is that evidence which is external to the patent and file history, such as expert testimony, inventor testimony, dictionaries, and technical treatises and articles." *Vitronics*, 90 F.2d at 1584. Extrinsic evidence, however, is "less significant than the intrinsic record in determining the legally operative meaning of claim language." *Secure Web Conference Corp. v. Microsoft Corp.*, No. 13-CV-2642, 2014 WL 4954644, at *2 (E.D.N.Y. Oct. 2, 2014) (citing *Phillips,* 415 F.3d at 1317). The Federal Circuit condones the use of dictionaries "to assist in understanding the commonly understood meaning of words," *Phillips,* 415 F.3d at 1317, and has held that "[c]ourts may rely on dictionary definitions when construing claim terms, so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents." *3M*

*Innovative Properties Co. v. Tredegar Corp.*, 725 F.3d 1315, 1321 (Fed. Cir. 2013) (citing *Advanced Fiber Tech. (AFT) Trust v. J & L Fiber Servs., Inc.,* 674 F.3d 1365, 1374–75 (Fed. Cir. 2012)).

The Federal Circuit, however, cautions courts not to place "too much reliance on extrinsic sources such as dictionaries . . . and too little on intrinsic sources, in particular the specification and prosecution history.". *Phillips v. AWH Corp.*, 415 F.3d 1303, 1320 (Fed. Cir. 2005) (citing *Texas Digital,* 308 F.3d at 1204). The Federal Circuit clarified that the principles outlined in *Texas Digital Systems, Inc. v. Telegenix,* 308 F.3d 1193 (Fed. Cir. 2002)*,* which had encouraged the use of extrinsic sources such as dictionaries, should no longer guide a district court's consideration of dictionary definitions. The court held that the methodology adopted in *Texas Digital* "placed *,* 415 F.3d at 1320. As the Federal Circuit explained in *Phillips*:

> The main problem with elevating the dictionary to such prominence is that it focuses the inquiry on the abstract meaning of words rather than on the meaning of claim terms within the context of the patent .... [I]f the district court starts with the broad dictionary definition in every case and fails to fully appreciate how the specification implicitly limits that definition, the error will systematically cause the construction of the claim to be unduly expansive.

*Phillips,* 415 F.3d at 1321.  Accordingly, the Federal Circuit directs district courts "focus[ ] at the outset on how the patentee used the claim term in the claims, specification, and prosecution history" instead of "starting with a broad definition and whittling it down," *Id.*

"A word or phrase used consistently throughout a claim should be interpreted consistently." *Epcon Gas Sys., Inc. v. Bauer Compressors, Inc.,* 279 F.3d 1022, 1031 (Fed. Cir. 2002) (citing *Phonometrics, Inc. v. Northern Telecom Inc.,* 133 F.3d 1459, 1465 (Fed. Cir. 1998).  On the other hand, where a claim term is used "in two contexts with a subtle but significant difference" the term "should not necessarily be interpreted to have the same meaning in both phrases." *Epcon Gas Systems,* 279 F.3d at 1031.

Moreover, although claims are to be construed in light of the specification, courts must be careful not to read limitations from the specification into the claim. *Phillips,* 415 F.3d at 1323.  For example, if a patent specification describes only a single embodiment, the claims of the patent should not be construed as limited to that embodiment in all circumstances. *Id.*  Rather, it is to be understood that the purpose of the specification "[is] to teach and enable those of skill in the art to make and use the invention" and that sometimes, the best way to do that is to provide an example.

*Id.* Similarly, the Federal Circuit has cautioned that "patent coverage is not necessarily limited to inventions that look like the ones in the figures," noting that taking such an approach to claim construction would amount to "import[ing] limitations onto the claim from the specification, which is fraught with danger." *MBO Laboratories, Inc. v. Becton, Dickinson & Co.,* 474 F.3d 1323, 1333 (Fed. Cir. 2007).

## B. Application

The court need only construe the disputed claim language "to the extent necessary to resolve the controversy." *Vivid Techs., Inc. v. Am. Science & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999); *see also Ballard Med. Prods. v. Allegiance Healthcare Corp.*, 268 F.3d 1352, 1358 (Fed. Cir. 2001) ("If the district court considers one issue to be dispositive, the court may cut to the heart of the matter and need not exhaustively discuss all other issues presented by the parties."); *Biovail Corp. Int'l v. Andrx Pharms., Inc.*, 239 F.3d 1297, 1301 (Fed. Cir. 2001) (finding it unnecessary to construe claim term that was not relevant to outcome of the case). Accordingly, the court will construe only those claims that are in dispute between the parties: (1) "prongs"; (2) "elongated main member"; (3) "each of said end portions [of elongate main portion] including prongs"; and (4) "essentially disposed parallel."

Here, a "*Markman* hearing," or claim construction

hearing, to interpret the claim language is not necessary because the disputed claim terms are neither ambiguous nor highly technical.  *Revlon Consumer Products*, 2003 WL 21751833, at *14 (finding no need for a *Markman* hearing when sole disputed claim term, "completely coated," was neither ambiguous nor technical); *LRC Elec., Inc. v. John Mezzalingua Assocs., Inc.*, 974 F. Supp. 171, 181–82 (N.D.N.Y. 1997) ("A *Markman* hearing to define the [disputed claim] term . . . would only be necessary if the Court needed expert testimony to interpret the term . . . . After carefully considering the language used in claim one, the specification, and Webster's Dictionary, the Court finds that the meaning of the [claim] term . . . is the one stated in Webster's Dictionary . . . and hence no *Markman* hearing[ ] is needed in the instant case . . . .").  As such, the court may and will interpret and construe the disputed claims in its summary judgment decision.  The court addresses each of the disputed terms in turn.  For ease of reference, depicted below as Figure 1 of this Memorandum and Order, is the image provided as Figure 4 of the '766 patent.  (Compl. Ex. A, Fig. 4.)  Depicted as Figure 2 is a labelled diagram of defendant's accused product.  (Davis Decl. ¶ 3.)



Figure 1: The '766 Patent
(Compl. Ex. A, Fig. 4.)



Figure 2: Accused Product
(Davis Decl. ¶ 3.)

### i. Prongs

The '766 patent specifies "a pair of prongs, each prong of a said pair of prongs extending outwardly from opposite sides." (Compl. Ex. A, Col. 5.) The "prongs" are represented by 14A, 15A, 16A and 17A in figure 1. Defendant proposes that the term "prong" as used in the '766 patent means a "slender pointed or projecting part" like a "tine on a fork," and does not describe defendant's accused product which is comprised of a circle or segments forming a circle. (Def. Mem. at 10; Oral Argument Transcript ("Tr.") 5.) Defendant further argues that the court must look to the definition in the context of the patent - not extrinsic evidence - and contends that in the description and illustration of the patent, the term "prong" is used in a manner consistent with the meaning "short pointed part like a tine on a fork" that has "ends." (Def. Mem. at 10; ECF

No. 16, Defendant's Reply Memorandum in Support of Summary
Judgment ("Def. Reply") at 3; Tr. 5.)

Plaintiff contends that claim construction requires
that terms be given "the full range of their ordinary meaning as
understood by persons skilled in the relevant art." (Pl. Opp.
at 5.) Plaintiff also argues that defendant improperly combines
two independent definitions – "slender pointed or projecting
part" and "a tine on a fork" – to define the term "prong."
Plaintiff in turn proposes that prongs are defined as "slender
projecting parts" that need not be pointed, and may encompass
portions of circle as present in the accused product's design.
(Pl. Opp. at 6; Tr. 18.) Moreover, plaintiff contends that,
although "a prong as we normally look at it has an end, . . . .
[p]rongs don't have to have an end." (Tr. 18.) As an example,
plaintiff cited to prongs of a river that do not end. (*Id.*)

First, the court gives the term "prong" its ordinary
and customary meaning, because a special definition is not used
in the specification or prosecution history. *See Grober v. Mako
Products, Inc.*, 686 F.3d 1335, 1341 (Fed. Cir. 2012) (citing
*Phillips,* 415 F.3d at 1312–1313; *Vitronics,* 90 F.3d at 1582. To
determine the "ordinary and customary meaning" of a claim term,
a court must first consult the patent's intrinsic evidence,
specifically the claims, the specification, and the prosecution
history. *See, e.g., Primos, Inc. v. Hunter's Specialties, Inc.,*

451 F.3d 841, 847-48 (Fed. Cir. 2006); *Kinik Co. v. Int'l Trade Comm'n,* 362 F.3d 1359, 1365 (Fed. Cir. 2004); *Small v. Nobel Biocare USA, LLC*, No. 05-CV-3225, 2011 WL 3586470, at *4 (S.D.N.Y. Aug. 11, 2011) *on reconsideration in part,* No. 05-CV-3225, 2012 WL 952396 (S.D.N.Y. Mar. 21, 2012).

The court first turns to the specification, including all of the claims, as "[c]laims must be read in view of the specification, of which they are a part." *Markman,* 52 F.3d at 979. Here, the '766 patent specification does not explicitly define "prong," and describes the prongs as "extending outwardly from opposite sides of said main portion in substantially opposite directions" and as "curved and directed toward one of said prongs on the other said end portion." (Compl. Ex. A, Col. 5.) The specification also indicates that each prong "extends inwardly toward another one said prong of a second said pair of prongs." (*Id.*) The patentee further describes the prongs in Claim 6 as "being essentially C-shaped, and the other said end portions being essentially an inverted C-shape." (*Id.*) Thus, the entire specification leaves the reader with the impression that the prongs extend away from the center piece towards the opposite end.

The specification, however, does not include any language indicating that the prongs on opposite ends constitute portions of the same semi-circle or that the prongs extend

*continuously* to connect with the prongs on the other end portion. "If an apparatus claim recites a general structure (e.g., a noun) without limiting that structure to a specific subset of structures (e.g., with an adjective), the Federal Circuit generally construes the claim to cover all known types of that structure that are supported by the patent disclosure." *Aspex Eyewear*, 386 F. Supp. 2d at 537 (citing *Renishaw PLC v. Marposs Societa' per Azioni,* 158 F.3d 1243, 1250 (Fed. Cir. 1998)). Indeed, the patentee need not "describe in the specification every conceivable and possible future embodiment of his invention." *Id.* (citing *CCS Fitness v. Brunswick Corp.,* 288 F.3d 1359, 1366 (Fed. Cir. 2002) (internal citations omitted)).

Although the specification does not explicitly limit the "prongs" to structures that include a tip or endpoint, the description of each pair of prongs as "C-shaped" or an "inverted C-shape" suggests that the prongs have endpoints and do not meet; otherwise, the patentee would have further indicated that the prongs may altogether form an oval or circular shape. Thus, although the language does not preclude the possibility that the prongs extend continuously toward each other until they meet, the fact that this possibility exists does not put the public on notice that a continuous extension was within the patentee's intended specifications. Thus, the term "prong" as used in the

specification suggests a "slender pointed or projecting part" with an outward extension with an end point or tip.

Next, the court reviews the '766 patent's prosecution history to ascertain the true meaning or effect in the use of the word "prong." The use of the word prongs is consistent throughout the prosecution history of the '766 patent, and is consistent with the ordinary use of the word as a "slender pointed or projective part." Indeed, in the initial patent application filed, Patent No. 7,278,900, the patentee described each of the "end portions" as containing "prongs" which extended inward toward the prongs at the opposite ends of the structure. (Spencer Decl. Ex. B, at 3.) These "end portions" are again described as "substantially C-shaped" and "substantially an inverted C-shape." (*Id.* at 4.)

Although plaintiff invites the court to construct a broader meaning of the term "prong," – indeed suggesting that "prongs of a river do not end" (Tr. 18) – the court finds that there is no indication from the intrinsic evidence that the prongs as described in the '766 patent have a meaning broader than the ordinary meaning, or that the prongs may continuously extend toward one another to meet or fuse together, forming a half circle. Accordingly, the court respectfully declines to apply a meaning to the term "prongs" that is broader than specification requires.

Finally, the court may look to extrinsic evidence, if necessary, for additional clarity with regard to the proper construction of "prong." Because "prong" is neither an ambiguous nor complex term, additional reference to extrinsic evidence is not necessary. After consideration of the ordinary language and the usage of the phrase in the specification and prosecution history, the court construes "prong" as a slender outward projecting part with a tip or endpoint.

### ii. Elongate Main Portion

The '766 specification requires a "retaining member having an elongate main portion," used interchangeably with "a bra strap retainer comprising at least a pair of strap-retaining members positioned at opposite ends of the retainer, respectively, and an elongated member extending between the strap-retaining members." (Compl. Ex. A.) The elongate main portion is depicted as 30 in Figure 1. Defendant proposes that the phrase "elongate main portion" as used in the '766 patent requires "one contiguous main portion." (Def. Mem. at 11.) Defendant argues that the accused product is missing an "elongate main portion" because the center portion is split. (*Id.*)

Plaintiff defines "elongate main portion" as something that has a length which is greater than its width. (Tr. 12.) Plaintiff argues that the '766 patent does not define "elongate

main portion" or "elongated member" as being a single piece, but only indicates that there must be a main central portion of the invention that is elongated. (Pl. Opp. at 8.) Indeed, plaintiff contends that the patent's "claim language does not preclude the splitting of the elongate main portion." (*Id.*) Defendant argues in its Reply that plaintiff is attempting to use a definition for "elongate main portion" that is divorced from the context of the specification and instead contends that the fact that a split main portion is possible does not provide "explicit or implicit notice to the public." (Def. Reply at 4.)

First, the ordinary and customary meaning of "elongate main portion" suggests a single main, or central, structure that is longer in its length than in its width, and that is main, or principal or central, to the product in relation to the other parts. Indeed, a structure that is identical in length and height would be a square. Thus, any "elongate structure" would be longer in length than the other. "Main portion" suggests a structure that is central to the apparatus.

In reading the claim term "elongate main portion" in view of the specification, there is no indication that the term "elongate main portion" has a meaning different than the ordinary meanings. Moreover, the specification uses the terms "elongate main portion" and "elongated member" interchangeably, and the usage of the term in the specification indicates that

the "elongated member" extends substantially across the
apparatus and constitutes a "main" or central structure in the
overall apparatus. Thus, the term "elongated member" also
refers to the "main portion," despite omission of the term
"main." Claim 15 describes the "elongated member" as "extending
*between* the strap retaining members," where such strap retaining
members are "positioned at opposite ends of the retainer."
(Compl. Ex. A, Col. 6.) The specification further states that
an "elongated member *extends across the bra strap retainer* from
opposite ends of the bra strap retainer" indicating that the
elongate piece extends across the entirety of the apparatus and
represents a majority portion of the overall specification.
(*Id.*) Moreover, the description suggests that this elongated
member spans across from one end of the apparatus to the
opposite end without a substantial split or break in the middle
or at any point. Although plaintiff's contention that the
patent does not explicitly preclude "elongate main portions"
from being split in the center is correct, the language of the
specification suggests that the main elongate structure is
contiguous and does not otherwise put the public on notice that
the structure could be split or otherwise broken apart in a
substantial way.

Next, the court will consider the prosecution history
of the patent. During prosecution and the reissue of the '766

patent, the patentee added Claims 12 to 15, which refer to the "elongate main portion" as a "elongated member" and require that the "elongated member extend[] across the bra strap retainer from opposite ends of the bra strap retainer." (Spencer Decl. Ex. B, '600 Application Amendment at 6.)  The patentee added Claims 12 to 15 to address the Patent Office's finding that "a weave member" was not disclosed in the prior specification; thus the patentee amended the application to use the term "elongated member."  Nothing in the patent's prosecution history indicates that the term "elongated main portion" or "elongated member" has a meaning that diverges from the ordinary meaning of the words.

Finally, there is no ambiguity or complexity in the phrase "elongated main portion" or "elongated member" that requires consideration of extrinsic evidence.  After consideration of the ordinary language and the usage of the phrase in the specification and prosecution history, the court construes "elongate main portion" or "elongated member" as a main structure that is longer than it is wide, and that extends continuously across the opposite ends of the apparatus without a substantial break or gap.

### iii. Each of said end portions [of elongate main portion] including prongs

The specification requires that "each of said end portions [of the elongate main portion] includes a pair of

31

prongs." The end portions are depicted as 32 and 33 in Figure 1. Defendant argues that, assuming that the elongate main portion could be split, each of the elongate main portions' end portions located in the center of the accused product at the "split" does not include a pair of prongs. (Def. Mem. at 13.) Thus, under defendant's construction of the claim, the "end portions" of the elongate main portion reside at the center of the accused product, at A1/A2 and A3/A4 of Figure 2.

The ordinary and customary meaning of this phrase indicates that each "end portion" of the main structure requires prongs. Should the court accept that the center piece is the "elongate main portion," though split, the dispute is whether the inner edges in the accused product constitute "end portions" that would require prongs or whether the "end portions" reside at the outermost edges of the structure. The specification is clear in the requirement that each "end portion" contain a pair of prongs.

The ordinary meaning of "end" is "a point that marks the limit of something," "the point at which something no longer continues to happen or exist," or "the part at the edge or limit of an area." *Outside the Box Innovations, LLC v. Travel Caddy, Inc.*, 695 F.3d 1285, 1303 (Fed. Cir. 2012) (noting district court's construction of "end points" as "the outer edge of the end panels of the case"); *Research Plastics, Inc. v. Fed.*

*Packaging Corp.*, 421 F.3d 1290, 1296 (Fed. Cir. 2005) (defining the claim term "rear end" as referring to the "outermost edge of the tube" including the inside and outside edges); *see also End*, Merriam-Webster Dictionary, *http://www.merriam-webster.com/dictionary/end.* Thus, the ordinary meaning of end portion suggests that it means the outer most edge or limiting point of a structure.

In view of the specification and the prosecution history, the use of the word "end portions" does not deviate from its ordinary meaning. The specification describes the "end portions" as "opposite end portions positioned at opposite ends of said main portion" and suggests that these end portions reside at the outermost limits of the apparatus. Moreover, the specification and prosecution history assume a single main portion – whether split or not – and thus assumes that there are only two ends on the outer most limits of the horizontal plane.

Because the phrase "each of said end portions [of elongate main portion] including prongs is neither ambiguous nor complex, additional reference to extrinsic evidence is not necessary. Thus, after consideration of the ordinary language and the usage of the phrase in the specification and prosecution history, the court construes "each of said end portion" as the outer most edges or limiting points of a structure.

iv.  Essentially Disposed Parallel

The specification requires that "each of said prongs ha[s] an outer portion which is essentially disposed parallel to said elongate main portion."  (Compl. Ex. A.)  Defendant argues that plaintiff improperly cites to an imaginary tangent line in the accused product as parallel to the main portion but "parallel" is defined as "extend[ing] in the same direction and everywhere equidistant."  Thus, no singular point of a curved surface can be considered parallel.  Defendant also argues that plaintiff improperly construes "essentially disposed parallel" to read on an imaginary tangent line to a circle, rendering the term "parallel" meaningless, and that plaintiff attempts to divorce the claim terms from the context of the specification.

Plaintiff argues that defendant improperly limits the definition of "essentially disposed parallel" and disregards the modifier "essentially" to conclude that the claim term requires the relevant portions to be "completely parallel."  (Pl. Opp. At 7.)  Plaintiff contends that the addition of the word "essentially" indicates that the prongs need not be fully parallel, and that "essentially" would otherwise have no operative meaning in the patent/claim.  (Pl. Opp. at 7.)

The court agrees that a claim construction should give meaning to all the terms in a claim.  Indeed, claims must be "interpreted with an eye toward giving effect to all terms in

the claim." *Bicon, Inc. v. Straumann Co.,* 441 F.3d 945, 950
(Fed. Cir. 2006); *see Merck & Co. v. Teva Pharm. USA, Inc.,* 395
F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that
gives meaning to all the terms of the claim is preferred over
one that does not do so."); *TouchTunes Music Corp. v. Rowe Int'l
Corp.,* 727 F. Supp. 2d 226, 233 (S.D.N.Y. 2010) (citing *Stumbo
v. Eastman Outdoors, Inc.,* 508 F.3d 1358, 1362 (Fed. Cir. 2007))
("A claim construction that renders claim language superfluous
is almost always incorrect."). However, giving the ordinary
meaning to "essentially disposed parallel" suggests that the
prongs, although they need not be fully parallel, must
fundamentally and basically tend toward or incline toward
parallel, at least more so than not. The combination of
"essentially" and "parallel" creates an interesting conundrum
for the court, because fixtures that are not completely parallel
are not parallel at all. The ordinary meaning of parallel is
"extending in the same direction, everywhere equidistant, and
not meeting" or "everywhere equally distant." Parallel is a
mathematical concept and characterization that cannot be
qualified; something either is or is not parallel. Words of
approximation, however, such as "substantially," "generally," or
"essentially," as it is used here, are commonly used in patent
claims to avoid strict numerical boundary to specific
parameters. *Anchor Wall Sys., Inc. v. Rockwood Retaining Walls,*

*Inc.*, 340 F.3d 1298, 1310-11 (Fed. Cir. 2003). Thus, it would be improper to interpret the phrase "essentially disposed parallel" to be limited to the ordinary meaning of "disposed parallel." Accordingly, the court constructs the phrase "essentially disposed parallel" to mean something close to being parallel, but with some deviation.

The prosecution history reveals that the Patent Office's rejected the patentee's application as being anticipated by prior art of Wyeth. (Spencer Decl. Ex. A, '929 Amendment, dated February 7, 2007 at 3, 7.) The Patent Office had found that the Wyeth patent, U.S. Patent No. 1,401,227, anticipated the patent-in-suit by having an "elongate main portion 4 and opposite end portions at opposite ends thereof with each end portion including a pair of prongs." (Spencer Decl. Exs. A, Rejection at 2.) In response, the patentee added language that "each of said prongs has an outer portion which is essentially disposed parallel to said elongate main portion, said prongs and said elongate main portion being adapted to retain the straps of the bra therebetween with the straps being wound through said slots between said prongs and said elongate main portion." (*Id*. at 3.) Thus, the prosecution history suggests that the specification requires prongs with an outer portion that is at least more parallel than the prongs depicted in the Wyeth patent.

There is no remaining ambiguity or complexity in the phrase "essentially disposed parallel" that requires consideration of extrinsic evidence. Thus, after consideration of the ordinary language and the usage of the phrase in the specification and prosecution history, the court construes "essentially disposed parallel" to define structures that are substantially or nearly parallel, but contain some amount of deviation.

## III. Summary Judgment on Literal Infringement

### A. The Parties' Arguments

Defendant argues that no literal infringement exists because the accused patent is missing the following limitations from the patent's independent claims 1, 6, 8 and 12: (1) prongs; (2) an elongate main portion; (3) end portions [of the elongate main portion] including prongs; and (4) prongs that are "essentially disposed parallel" to the main elongate portion. (Def. Mem. at 9.)

### B. Legal Standard for Literal Infringement

A patent is infringed if a single claim is infringed. *See Grober*, 686 F.3d at 1344; *Intervet America, Inc. v. Kee-Vet Labs., Inc.,* 887 F.2d 1050, 1055 (Fed. Cir. 1989). "Literal infringement requires that each and every claim limitation [within each of the patent's claims] be present in the accused product." *Spiel Associates*, 2010 WL 546746, at *7 (citing

*Abraxis Bioscience v. Mayne Pharma (USA) Inc.,* 467 F.3d 1370, 1378 (Fed. Cir. 2006)). If even "one [claim] limitation is missing or not met as claimed," there can be no literal infringement. *Mas-Hamilton Group v. LaGard, Inc.,* 156 F.3d 1206, 1211 (Fed. Cir. 1998).

In determining whether an accused product is infringing on the patent-at-issue, first, as discussed *supra,* "the court determines the scope and meaning of the patent claims asserted," and second, the court compares the claims "to the allegedly infringing devices." *Grober*, 686 F.3d at 1344 (citing *Cybor Corp. v. FAS Techs., Inc.,* 138 F.3d 1448, 1451 (Fed. Cir. 1998)); *Vitronics*, 90 F.3d at 1581-82 (citing *Markman,* 52 F.3d at 976) ("A literal patent infringement analysis involves two steps: (1) the proper construction of the asserted claim and (2) a determination as to whether the accused method or product infringes the asserted claim as properly construed.").

C. **Application**

"One who does not infringe an independent claim cannot infringe a dependent claim on (and thus containing all the limitations of) that claim." *Becton Dickinson and Co. v. C.R. Bard, Inc.,* 922 F.2d 792, 798 (Fed. Cir. 1990) (*quoting Wahpeton Canvas Co. v. Frontier, Inc.,* 870 F.2d 1546, 1553 (Fed. Cir. 1989)); *Carotek, Inc. v. Kobayashi Ventures, LLC*, 875 F. Supp. 2d 313 n.21, 338 (S.D.N.Y. 2012) (quoting *Muniauction, Inc. v. Thomson*

*Corp.*, 532 F.3d 1318, 1328–29 n.5 (Fed. Cir. 2008)) (noting that "[a] conclusion of noninfringement as to the independent claims requires a conclusion of noninfringement as to the dependent claims."). Because the holding of non-infringement of an independent claim applies to all claims dependent on that claim, the court's decision will only address the independent claims and their pertinent claim limitations set forth in the '776 patent. *ABC Indus., Inc. v. Kason Indus., Inc.*, 30 F. Supp. 2d 331, 339 n.5 (E.D.N.Y. 1998) *aff'd,* 217 F.3d 859 (Fed. Cir. 1999); *see Wolverine World Wide, Inc. v. Nike, Inc.,* 38 F.3d 1192, 1199 (Fed. Cir. 1994). As noted above, and discussed *supra*, the following claims in the patent-in-suit are "independent": Claim 1, Claim 6, Claim 8, and Claim 12. For ease of reference, a diagram of defendant's accused product is labelled in Figure 1.



Figure 2: Accused Product (Davis Decl. ¶ 3.)

i. Claims 1, 6, and 8

Claims 1, 6, and 8 of the patent-in-suit each require a "pair of prongs" positioned at the product's "end portions." (Compl. Ex. A, Cols. 5-6.)  Each claim also describes the "prongs" as "extending outwardly from opposite sides of said main portion in substantially opposite directions."  (*Id.*) Moreover, Claims 6 and 8 describe the prongs as "being curved and directed toward one of said prongs on the other said end portion" and "being essentially C-shaped" or "essentially an inverted C-shape."  (*Id.*)

Defendant argues that the accused product lacks a "pair of prongs" and is missing "each of said end portions [of elongate main portion] includ[ing] a pair of prongs."  (Def.

Mem. at 12-13.)  Plaintiff, however, contends that the "pair of
prongs" in the accused product consist of the circle segments
located at points C, D, E and F in Figure 1.  (Pl. Opp. at 7.)
Plaintiff further argues that, in any event, it is a question
for the jury whether "segments of a circle" can be considered
within the scope of the court's constructed claim term, which
plaintiff asserts should be defined as a "slender projecting
part."  (*Id.*)  Defendant responds by arguing that the dispute
regarding the scope of a prong is a legal one and that
"Plaintiff's legal position relies on the overruled law of *Texas
Digital*, divorcing a term from the specification.  As such,
Plaintiff fails to 'identify genuine issues that preclude
summary judgment.'"  (Def. Reply at 4.)

As discussed in the Claim Construction, the phrase
"pair of prongs" describes a pair of slender projecting parts
with tips or endpoints that do not meet.  Thus, applying this
definition, as discussed in the court's Claim Construction,
defendant's accused product does not fall within the scope of
the '766 patent's claims and therefore does not literally
infringe upon Claims 1, 6, and 8.

Although the analysis may stop here, even assuming,
*arguendo*, that the circle segments depicted at points C, D, E
and F in Figure 2 constitute "prongs," and further asserting
that the split middle section constitute the "elongate main

41

portion" of the accused product, the court finds that the
"prongs" are not "essentially disposed parallel" to the
"elongate main portion," as required in Claims 1, 6, and 8.

Indeed, defendant argues that the accused product is
missing prongs with an outer portion "essentially disposed
parallel" to the elongate main portion and that plaintiff
improperly "cites to an imaginary tangent line as parallel to
the main portion," which is not disclosed in the patent's
specification.  (Def. Mem. at 13-14.)  Plaintiff responds with
the argument that the term "essentially parallel" is "used to
describe the curved portions of the prongs of the '766 patent."
(Pl. Opp. at 8.)  Plaintiff also contends that defendant
misconstrues "essentially parallel" as being fully parallel,
however, the addition of the word "essentially" indicates that
the specification "does not require a complete parallel
arrangement between the 'prongs' and 'elongate main portion';
otherwise "essentially" would have no operative meaning in the
patent/claim.  (Pl. Opp. at 7-8.)

In response, defendant argues that the specification
requires that the "outer portion" of the prongs must be
"essentially parallel" to the main elongate portion, and
plaintiff impermissibly substitutes an undisclosed, imaginary
tangent line touching a point on a curved portion to read the

accused product onto the specification's claims.  (Def. Reply at 6.)

          Accepting plaintiff's tangent theory, there are only *two* points on the rounded ends – one at the top and one at the bottom, located at points H1 and H2 in Figure 1 – from which one can draw an imaginary tangent line that is parallel with the center main portion.  Applying plaintiff's argument, there are four "prongs."  Thus, a second tangent line would necessarily have to be drawn to account for the other two prongs.  Although the term "essentially disposed" permits some deviation from the requirement of being parallel – and thus, other tangent lines may be drawn to be "essentially disposed parallel" to the main piece – this exercise raises a threshold problem of determining at what point a tangent line is no longer "essentially parallel."  In any event, merely indicating that a tangent line *could* be drawn from a certain point on a curved surface to render it parallel to a straight line, does not, in fact, render those two points parallel.  Accordingly, the court respectfully rejects plaintiff's argument that an imaginary tangent line may be drawn in order to dispose the curved edge parallel to the center main piece and finds that the accused product lacks "prongs" with an outer portion "essentially disposed parallel" to an elongate main portion.

ii.  Claim 12

Claim 12 does not require "prongs," but requires, "at least a pair of strap retaining members positioned at opposite end of the retainer, respectively, and an *elongated member* extending between the strap-retaining members."  (Compl. Ex. A, Col. 6.)  "Elongated member" as used in Claim 12 is used interchangeably with the term "elongate main portion" in Claims 1, 6 and 8.

Defendant argues that the accused product is missing an "elongate main portion" because the center portion of defendant's accused product is split, whereas an "elongate main portion" suggests a long, contiguous central piece.  (Def. Mem. at 11-12.)  Plaintiff argues that the '766 patent does not define "elongate main portion" or "elongated member" as being a single piece, but only that there is a "main central portion of the invention that is elongated."  (Pl. Opp. at 8.)  Plaintiff further contends that the claim language does not preclude splitting of elongated portion.  (*Id.*)  Defendant argues in its Reply that plaintiff is attempting to use a definition divorced from the context of the specification – and that even if a split main portion is possible, the phrase does not provide "explicit or implicit notice to the public."  (Def. Reply at 4.)

Under the court's claim construction, "elongate main portion" or "elongated member," used interchangeably in the

singular form, describes a main structure that is longer than it is wide, and that extends continuously across the opposite ends of the apparatus without any substantial break or gap.  The court respectfully disagrees with plaintiff's contention that points A1, A2, A3, and A4 in Figure 2 together comprise the "elongate main portion," though split in defendant's accused product, because the center portion of the accused product does not extend across the product without a substantial break or split.  Indeed, the split between points A1/A2 and A3/A4 in Figure 2 is significant.  Moreover, the center pieces are not clearly the "main" piece of the structure, as sections C, D, E, and F of Figure 2, which comprise the outer circular frame of the structure, appear to comprise the "main" portion of the accused device, as the circular frame constitutes a majority of the accused device's structure.  Accordingly, the court finds that that Claim 12 does not read on defendant's accused product, as there is no "elongated member" or "elongate main portion" present in defendant's accused product.  Therefore, defendant's accused product does not contain the specific claim limitations of "prongs," and "elongate main portion" and does not literally infringe upon plaintiff's patent.

Based on the above construction of the claim, no reasonable jury could find literal infringement because the accused product is lacking claim limitations from each of the

independent claims. Specifically, the accused product lacks "prongs" that are "disposed essentially parallel," much less a "pair of prongs," and lacks an "elongate main portion" or "elongated member" as defined in the claim construction *supra*. The court need not reach the other disputed terms, because in order for a patent claim to be infringed, each and every limitation in the claim must be present in the accused product. Accordingly, summary judgment is granted in favor of defendant with respect to plaintiff's claims of literal infringement.

## IV. Summary Judgment on the Doctrine of Equivalents

### A. Legal Standard

#### i. Infringement Under the Doctrine of Equivalents

If literal infringement cannot be proven, a patent may still be infringed under the doctrine of equivalents. *Gemalto S.A. v. HTC Corp.*, 754 F.3d 1364, 1374 (Fed. Cir. 2014); *Eastcott v. Hasselblad USA, Inc.*, 564 F. App'x 590, 594 (Fed. Cir. 2014) ("[A] product or process that does not literally infringe upon the express terms of a patent claim may nonetheless be found to infringe if there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention."). A court may grant summary judgment of non-infringement in favor of defendant with respect to plaintiff's theory of infringement under the doctrine of equivalents if no reasonable factfinder could find

that "there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention." *Eastcott*, 564 F. App'x at 590 (citing *Warner–Jenkinson Co. v. Hilton Davis Chem. Co.,* 520 U.S. 17, 21 (1997)) ("[A] product or process that does not literally infringe upon the express terms of a patent claim may nonetheless be found to infringe if there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention."); *see Wireless Ink*, 969 F. Supp. 2d at 325 ("To prove infringement under the doctrine of equivalents, a patentee must show that "there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention.").

The purpose of the doctrine of equivalents is to "temper unsparing logic and prevent an infringer from stealing the benefit of the invention." *Festo Corp. v Shoketsu Kinzoku Kogyo Kabushiki Co.*, 344 F.3d 1359, 1366 (Fed. Cir. 2003). As such, the doctrine seeks to strike a balance between ensuring full protection for the patentee while simultaneously ensuring that the claims of the patent provide fair notice with regard to the patent's scope. *Id.*

When relying on the doctrine of equivalents to oppose a motion for summary judgment of non-infringement, "a patentee must provide particularized testimony and linking argument as to

the insubstantiality of the differences between the claimed
invention and the accused device or process," or, when
appropriate, the function-way-result test.[2] *AquaTex,* 479 F.3d at
1328 (citation and internal quotation marks omitted); *see
Eastcott*, 564 F. App'x at 595; *Motionless Keyboard Co. v.
Microsoft Corp.,* 486 F.3d 1376, 1382 (Fed. Cir. 2007); *Wireless
Ink Corp.*, 969 F. Supp. 2d at 325; *Texas Instruments Inc. v.
Cypress Semiconductor Corp.*, 90 F.3d 1558, 1567 (Fed. Cir. 1996)
("[A] patentee must . . . provide particularized testimony and
linking argument as to the 'insubstantiality of the differences'
between the claimed invention and the accused device or process,
or with respect to the function, way, result test when such
evidence is presented to support a finding of infringement under
the doctrine of equivalents.").

The Federal Circuit has made clear that the evidence
of equivalents must be from the perspective of someone skilled
in the art, such as an expert or one versed in the technology or
by documents, including texts and treatises. *Eastcott*, 564 F.
App'x at 595; *AquaTex Indus., Inc. v. Techniche Solutions,* 479

---

[2] The doctrine of equivalents allows patent owners to prove infringement even
where a device or process does not fall within the literal scope of a
patent's claims. The courts have developed a number of tests for applying
the doctrine of equivalents, the most common of which is the "function-way-
result" test. *Graver Tank & Mfg. Co. v. Linde Air Prods.*, 339 U.S. 605
(1950). Under the function-way-result test, equivalence is met if an element
in the accused product "performs substantially the same function, in
substantially the same way, to achieve substantially the same result" as
disclosed in the claim. *Voda v. Cordis Corp.*, 536 F.3d 1311, 1326 (Fed. Cir.
2008).

F.3d 1320, 1329 (Fed. Cir. 2007). "Generalized testimony as to
the overall similarity between the claims and the accused
infringer's product or process will not suffice." *AquaTex,* 479
at 1328; *Texas Instruments*, 90 F.3d at 1566.

Indeed, the Federal Circuit explained in *AquaTex* that,
when the patent holder relies on the doctrine of equivalents
rather than literal infringement, he must meet additional
requirements in order to survive summary judgment.
Specifically:

> [W]hile many different forms of evidence may
> be pertinent, when the patent holder relies
> on the doctrine of equivalents, as opposed
> to literal infringement, the difficulties
> and complexities of the doctrine [of
> equivalents] require that evidence be
> presented to the jury or other fact-finder
> through the particularized testimony of a
> person of ordinary skill in the art,
> typically a qualified expert, who (on a
> limitation-by-limitation basis) describes
> the claim limitations and establishes that
> those skilled in the art would recognize the
> equivalents.

*AquaTex,* 479 F.3d at 1329; *see Eastcott*, 564 F. App'x at 594-95.
Accordingly, in *AquaTex* and its progeny, where the plaintiff
failed to provide particularized testimony from an expert or
person skilled in the art that specifically addressed
equivalents, and provided only lawyer argument and/or
generalized testimony about the accused product, the court
granted summary judgment of non-infringement under the doctrine

of equivalents for failure to show the existence of a genuine
issue of material fact.  *AquaTex,* 479 F.3d at 1329; *see also
Eastcott*, 564 F. App'x at 594-95 (affirming grant of summary
judgment of non-infringement where plaintiff failed to provide
the particularized testimony on a limitation-by-limitation basis
to establish the existence of a genuine issue of fact regarding
infringement under the doctrine of equivalents); *Motionless
Keyboard,* 486 F.3d at 1382 (affirming grant of summary judgment
of non-infringement because the patentee "did not provide any
particularized testimony to show infringement under the doctrine
of equivalents"); *Wireless Ink*, 969 F. Supp. 2d at 338 (granting
summary judgment of non-infringement where plaintiff offered no
evidence to support a theory of infringement under the doctrine
of equivalents, much less the "particularized testimony and
linking argument on a limitation-by-limitation basis" required
under well-established precedent).

The doctrine of equivalents may be met in one of two
ways.  *See Voda v. Cordis Corp.*, 536 F.3d 1311, 1326 (Fed. Cir.
2008) (noting that the Federal Circuit applies two articulations
of the test for equivalence – the insubstantial differences test
and the function-way-result test).  First, under the
"insubstantial differences" test, a claim element is
equivalently present in an accused device if only "insubstantial
differences" distinguish the missing claim element from the

corresponding aspects of the accused device. *Id.*; *Sage Products, Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1423 (Fed. Cir. 1997); *Astra Aktiebolag v. Andrx Pharm., Inc.*, 222 F. Supp. 2d 423, 504 (S.D.N.Y. 2002) *aff'd sub nom. In re Omeprazole Patent Litig.*, 84 F. App'x 76 (Fed. Cir. 2003) ("The test for whether an element in the infringer's product or process is equivalent to a claimed element is whether the differences between the two are insubstantial to one of ordinary skill in the art."). Alternatively, under the function-way-result test, equivalence is met if an element in the accused product "performs substantially the same function, in substantially the same way, to achieve substantially the same result" as disclosed in the claim. *Voda*, 536 F.3d at 1326; *Spiel Associates*, No. 03-CV-4696, 2010 WL 546746, at *8 (citing *Abbott Labs. v. Sandoz, Inc.,* 566 F.3d 1282, 1296-97 (Fed. Cir. 2009)) (internal citations omitted); *see Am. Calcar, Inc. v. Am. Honda Motor Co., Inc.,* 651 F.3d 1318, 1338 (Fed. Cir. 2011) (citation and internal quotation marks omitted).

Further, the use of a substitute with "known interchangeability" with a literally claimed element is an objective factor to be considered in determining equivalence. *Warner–Jenkinson Co. v. Hilton Davis Chem. Co.,* 520 U.S. at 36; *Ring & Pinion Serv. Inc. v. ARB Corp.*, 743 F.3d 831, 834 (Fed. Cir. 2014) (citing cases). The "known interchangeability" test

looks to the knowledge of the skilled artisan to see whether the artisan would "contemplate the interchange as a design choice." *Interactive Pictures Corp. v. Infinite Pictures, Inc.,* 274 F.3d 1371, 1383 (Fed. Cir. 2001). "An important factor is whether persons reasonably skilled in the art would have known of the interchangeability of an ingredient not contained in the patent with one that was." *Graver Tank & Mfg. Co. v. Linde Air Products Co.,* 339 U.S. 605, 609 (1950). Proof of interchangeability must be proffered "through testimony of experts or others versed in the technology; by documents, including texts and treatises; and, of course, by the disclosures of the prior art." *Id.* at 609.

Because "the doctrine of equivalents necessarily adds uncertainty to the scope of patent claims, and thereby detracts from the public-notice function of patent claims and risks deterring non-infringing and potentially innovative endeavors," courts have developed rules that "constrain when and how the doctrine of equivalents is to be applied." *Freedman Seating Co. v. Am. Seating Co.,* 420 F.3d 1350, 1358 (Fed. Cir. 2005) (citing *Festo,* 535 U.S. at 727). First, the "all-elements rule" establishes "that an accused product or process is not infringing unless it contains each limitation of the claim, either literally or by an equivalent." *Id.* Accordingly, equivalence under the doctrine of equivalents must be assessed

on a limitation-by-limitation basis, as opposed to from the perspective of the invention as a whole. *Gemalto*, 754 F.3d at 1374 (Fed. Cir. 2014) (quoting *Warner–Jenkinson,* 520 U.S. at 29) ("Each element contained in a patent claim is deemed material to defining the scope of the patented invention, and thus the doctrine of equivalents must be applied to individual elements of the claim, not to the invention as a whole.") (internal citation omitted); *AquaTex Indus., Inc. v. Techniche Solutions,* 479 F.3d 1320, 1328 (Fed. Cir. 2007) ("[E]vidence [of infringement under doctrine of equivalents] must be presented on a limitation-by-limitation basis."). Second, "an element of an accused product or process is not, as a matter of law, equivalent to a limitation of the claimed invention if such a finding would entirely vitiate the limitation." *Freedman Seating,* 420 F.3d at 1358. "[C]ourts must consider the totality of the circumstances of each case and determine whether the alleged equivalent can be fairly characterized as an insubstantial change from the claimed subject matter without rendering the pertinent limitation meaningless." *Id.* at 1359.

ii. Defendant's Alleged Defenses to the Doctrine of Equivalents

a. *Ensnarement of Prior Art*

The doctrine of equivalents cannot be applied in a manner that would "ensnare" or encompass the prior art as the

Federal Circuit "has consistently limited the doctrine of
equivalents to prevent its application to ensnare prior art."
*Gemalto*, 754 F.3d at 1374-75 (citing *Marquip, Inc. v. Fosber
Am., Inc.,* 198 F.3d 1363, 1367 (Fed. Cir. 1999) (internal
citation omitted); *DePuy Spine, Inc. v. Medtronic Sofamor Danek,
Inc.*, 567 F.3d 1314, 1322 (Fed. Cir. 2009) ("Ensnarement bars a
patentee from asserting a scope of equivalency that would
encompass, or 'ensnare,' the prior art.") (internal citations
omitted).   In other words, a patentee cannot assert a range of
equivalents that encompasses prior art.   In *Marquip,* the Federal
Circuit recognized that "[b]ecause prior art limits the
exclusive right available to an inventor, it also limits the
range of permissible equivalents of a claim."  *Marquip, Inc. v.
Fosber Am., Inc.,* 198 F.3d 1363, 1367 (Fed. Cir. 1999).
Accordingly, a plaintiff may not advance a theory of
infringement under the doctrine of equivalents that captures, or
ensnares, prior art.

          The burden of producing evidence of prior art to
challenge a hypothetical claim rests with an accused infringer,
but the burden of proving patentability of the hypothetical
claim rests with the patentee.  *Interactive Pictures*, 274 F.3d
at 1380 (citing *Streamfeeder, LLC v. Sure-Feed, Inc.,* 175 F.3d
974, 984 (Fed. Cir. 1999).  In conducting an ensnarement defense
analysis, a court may first construct a hypothetical claim that

would literally cover the accused device, then assess the
relevant prior art to determine whether the plaintiff has
carried its burden of persuading the court that the hypothetical
claim would still be patentable over the prior art.  *DePuy*
*Spine*, 567 F.3d at 1325 (citing *Interactive Pictures*, 274 F.3d
at 1380).  Ultimately, "[i]f such a claim would be unpatentable
under the applicable statute, then the patentee has overreached,
and the accused device is noninfringing as a matter of law."
*Id.*  Ensnarement, like prosecution history estoppel, is "to be
determined by the court, either on a pretrial motion for partial
summary judgment or on a motion for judgment as a matter of law
at the close of the evidence and after the jury verdict."  *DePuy*
*Spine*, 567 F.3d at 1324 (quoting *Warner–Jenkinson,* 520 U.S at 39
n.8.).

> b.  *Prosecution History Estoppel*

Prosecution history estoppel prevents a patentee from
recapturing through the doctrine of equivalents the subject
matter that the applicant surrendered during prosecution.
*Integrated Tech. Corp. v. Rudolph Technologies, Inc.*, 734 F.3d
1352, 1356 (Fed. Cir. 2013) *cert. denied*, 134 S.Ct. 2873 (2014)
(citing *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.,* 535
U.S. 722, 734 (2002); *Pall Corporation v. Micron Separations,* 66
F.3d 1211, 1218 (Fed. Cir. 1995) ("Prosecution history estoppel
limits infringement by otherwise equivalent structures, by

barring recapture by the patentee of scope that was surrendered in order to obtain allowance of the claims."). "There is a presumption that prosecution history estoppel applies when a patentee files an amendment seeking to narrow scope of claim and the reason for amendment was a substantial one relating to patentability." *Festo*, 344 F.3d at 1366. Thus, a patentee may not "recapture through equivalence . . . coverage given up [by argument or amendment] during prosecution." *Hormone Research Found., Inc. v. Genentech, Inc.,* 904 F.2d 1558, 1564 (Fed. Cir. 1990).

The patentee bears the burden of overcoming this presumption by "showing that the [narrowing] amendment does not surrender the particular equivalent in question." *Id.* at 740; *accord, e.g., Allen Eng'g Corp. v. Bartell Indus., Inc.,* 299 F.3d 1336, 1349–50 (Fed. Cir. 2002). The patent owner may rebut a defense of estoppel by establishing one of three exceptions by a preponderance of the evidence: (1) the alleged equivalent could not reasonably have been described at the time the amendment was made; (2) the alleged equivalent was tangential to the purpose of the amendment; or (3) the equivalent was not foreseeable (and thus not claimable) at the time of the amendment. *Integrated Tech.*, 734 F.3d at 1356.

The Federal Circuit explained in *Festo,* 344 F.3d at 1366, that the "first question in a prosecution history estoppel

56

inquiry is whether an amendment filed in the Patent and
Trademark Office ("PTO") has narrowed the literal scope of a
claim." *Festo,* 344 F.3d at 1366 (citing *Pioneer Magnetics, Inc.
v. Micro Linear Corp.,* 330 F.3d 1352, 1356 (Fed. Cir. 2003)).
The scope of the prosecution estoppel depends on "the inferences
that may reasonably be drawn from the amendment." *Festo,* 535
U.S. at at 737–38.  If the court finds that the amendment did
not narrow the literal scope of the claim, prosecution history
estoppel will not apply.  If, however, the accused infringer
establishes that the amendment was a narrowing one, then the
court must determine whether "the reason for that amendment was
a substantial one relating to patentability."  *See id.*  "[E]ven
if the amendment's purpose were unrelated to patentability, the
court might consider whether it was the kind of reason that
nonetheless might require resort to the estoppel doctrine," as
"a narrowing amendment made to satisfy any requirement of the
Patent Act may give rise to an estoppel."  *Id.* at 735–36.  "If
[an] amendment is truly cosmetic, then it would not narrow the
patent's scope or raise an estoppel.  On the other hand, if [an]
amendment is necessary and narrows the patent's scope — even if
only for the purpose of better description — estoppel may
apply."  *Id.* at 736–37.

    When the prosecution history record reveals no reason
for the narrowing amendment or the court is unable to discern

the purpose underlying an amendment narrowing a claim limitation, the court shall presume, for the purposes of estoppel, that the patentee had a substantial reason relating to patentability. *Id.* at 740. Thus, the patentee bears the burden of overcoming this presumption by "showing that the [narrowing] amendment does not surrender the particular equivalent in question." *Id.* at 740; *accord, e.g., Allen Eng'g Corp. v. Bartell Indus., Inc.,* 299 F.3d 1336, 1349-50 (Fed. Cir. 2002). Whether prosecution history estoppel applies, and whether the rebuttal of the presumption of surrender has been met, are questions of law for the court, not a jury, to decide. *Integrated Tech.*, 734 F.3d at 1356 (citing *Chimie v. PPG Indus. Inc.,* 402 F.3d 1371, 1376 (Fed. Cir. 2005)); *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 344 F.3d 1359, 1368 (Fed. Cir. 2003).

**B.  Application**

i. <u>Infringement Under the Doctrine of Equivalents</u>

Plaintiff argues that defendant's accused product infringes upon the '766 patent under the doctrine of equivalents. Defendant, however, argues that plaintiff's "proofs on equivalence" are insufficient to support a finding of infringement under the doctrine of equivalents because plaintiff has failed to set forth any "particularized testimony and linking argument" of a person of ordinary skill in the art. *See*

*AquaTex Indus., Inc. v. Techniche Solutions,* 479 F.3d 1320, 1328
(Fed. Cir. 2007). Plaintiff argues that it has shown that the
structures of the accused product and the patent are
interchangeable as devices to adjust the length of a single bra
strap and to secure straps on a user's back. Thus, plaintiff
contends that it has set forth highly probative evidence of
infringement under the doctrine of equivalents sufficient to
defeat defendant's motion for summary judgment, and that such
evidence should be presented to a jury. (Pl. Opp. at 11.)

As an initial matter, the structural simplicity of
both plaintiff's and defendant's devices weighs against finding
infringement under the doctrine of equivalents. Indeed,
"[c]ourts have resisted finding infringement under the doctrine
of equivalents when the claimed invention is a simple structural
device that can be easily described in words. This is so
because one justification for the doctrine of equivalents is
that words often fail to do an invention justice." *Van Blarcom
Closures, Inc. v. Owens-Illinois, Inc.*, 507 F. Supp. 2d 214,
228-29 (E.D.N.Y. 2007) (recommending a finding of non-
infringement under the doctrine of equivalents and noting that
"where the claimed invention is a simple structural device in an
already crowded art, and the claim limitations are clearly
stated and sharply defined, and the variation presented by the
accused device was foreseeable to the patent drafter, there may

indeed be few, if any, infringing equivalents."); *Street Flyers
LLC v. Gen-X Sports, Inc.*, 2003 WL 21998960, at *13 (S.D.N.Y.
Aug. 22, 2003) (granting summary judgment of non-infringement
under doctrine of equivalents where plaintiff failed to write
its claim to cover shoes with spring biasing the wheels in
either direction and therefore could not claim equivalence where
accused product's wheels contained springs biased in opposite
direction of those in plaintiff's product).

 Plaintiff appears to assert both an "insubstantial
differences" and "function-way-result" equivalence theory. (*See*
Pl. Mem. at 9, 13.)  Plaintiff also cites prior art to advance
its argument that "the known interchangeability of the accused
and claimed elements is potent evidence that one of ordinary
skill in the relevant art would have considered the change
insubstantial."  (Pl. Mem. at 10.)  Plaintiff references its
Rule 56.1 Statement of Facts to assert that U.S. Patent Numbers
2,278,153 (the "Shaulson Patent," attached to the Dunne
Declaration at Exhibit 6) and 1,769,753 (the "Reuter Patent,"
attached to the Dunne Declaration at Exhibit 7) disclose
structures very similar to the plaintiff's product, and that
European Patent Number EP1051926A1 (the "Fildan reference,"
attached to the Spencer Declaration as Exhibit D) discloses a
structure very similar to the structure of defendant's accused
product.  (Pl. Mem. at 10 (citing Plaintiff's Statement of Facts

¶¶ 2-4).) Specifically, plaintiff compares an illustration of the Reuter Patent (depicted below as Figure 3) and an illustration of the Shaulson Patent (depicted below as Figure 4),



Figure 3: Reuter Patent
(Dunne Decl. Ex. 7)



Figure 4: Shaulson Patent
(Dunne Decl. Ex. 6)

which resemble plaintiff's product, with an illustration of the Fildan Reference (depicted below as Figure 5), which resembles defendant's accused product,



Figure 5a: Fildan Reference
(Spencer Decl. Ex. D)

to contend that the "respective structures [of these devices] are 'potent evidence' to establish that they are known equivalents in the technical field of retainers for use with the straps of a brassiere." (Pl. Mem. at 11.)

Plaintiff argues that both types of structures depicted in these three devices may be used for the same purpose

– adjusting a single bra strap – therefore "it is known in the field that the unitary member can be the exterior 'prongs' or the central 'elongated member'" such that "[e]ither configuration works, and both perform the same function, in order to achieve the same result, in the same way." (Pl. Opp. at 13.) Plaintiff extends this reasoning to the brassiere strap retainers at issue in the instant case to conclude that "[w]hile [the Reuter, Shaulson and Fildan] devices are designed to be used to adjust the length of a single bra strap and do not disclose how to secure two bra straps together . . . [p]laintiff has demonstrated the interchangeability of the basic structures of the accused device of Brazabra and the patented device [which] is highly probative evidence of infringement under the doctrine of equivalents that properly should go to the jury." (Pl. Opp. at 11.)

Although "[t]he known interchangeability of substitutes for an element of a patent is one of the express objective factors . . . bearing upon whether the accused device is substantially the same as the patented invention," *Warner–Jenkinson Co. v. Hilton Davis Chem. Co.,* 520 U.S. at 36, and disclosures of prior art may be sufficient evidence, the court is unpersuaded. First, as indicated in *Warner–Jenkinson,* known interchangeability is not dispositive, and is only *one* factor to consider in a doctrine of equivalents analysis that may assist a

fact-finder in assessing the similarities and differences between a claimed and an accused element. *Warner-Jenkinson,* 520 U.S. at 37 ("A skilled practitioner's knowledge of the interchangeability between claimed and accused elements . . . tells the fact-finder about the similarities or differences between those elements"). Second, "the question of known interchangeability is not whether both structures serve the same function, but whether it was known that one structure was an equivalent of another." *Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.*, 145 F.3d 1303, 1309 (Fed. Cir. 1998). Thus, though relevant, the fact that devices for a single brassiere strap adjustment exist in alternative formations similar to that of the plaintiff's device and the accused device does not provide "potent evidence" that there is a "known interchangeability" between "pairs of prongs" and an "elongate main member" in a device used to retain two brassiere straps on a user's back.

Further, the fact that one device may be interchanged with another with a different configuration, does not establish "known interchangeability" for each of the claim limitations specified in plaintiff's patent. "Known interchangeability" must be assessed on a limitation-to-limitation basis and plaintiff is required to set forth evidence showing that the each of the parts of the accused product are known substitutes

for each of the claim limitations set forth in plaintiff's patent, specifically that the center pieces (points A1, A2, A3, and A4 of Figure 1) in the accused device are known substitutes of the "main elongate portion" in plaintiff's device, and that the circular outer frame (points C, D, E, and F of Figure 2) of the accused product is a known substitute of the "prongs" in plaintiff's device.

Moreover, plaintiff's argument that the Shaulson, Reuter, and Fildan Patents disclose structures that are interchangeable with one another and similar to that of the patent-in-suit and the accused product does not provide "particularized evidence" on a "limitation-to-limitation" basis to create a genuine issue of material fact as to whether the accused device infringes plaintiff's device by equivalents. *See Warner-Jenkinson Co. v. Hilton Davis Chemical Co.* 520 U.S. at 29 (noting that a doctrine of equivalents analysis must be applied to the individual claim limitations, not to the invention as a whole). Nor does plaintiff's theory address all the claim limitations in the patent-in-suit. Indeed, plaintiff does not offer any evidence, testimony, or even argument regarding the claim limitation that "each of said prongs . . . is essentially disposed parallel" or that "each of said end portions includes a pair of prongs." (Compl. Ex. A.) Plaintiff merely argues in a conclusory fashion, and without explanation, that the accused

product and the patent-in-suit's "respective structures are 'potent evidence' to establish that they are known equivalents in the technical field of retainers for use with straps of a brassiere" and that "[p]laintiff has demonstrated the interchangeability of the basic structures of the accused device of Brazabra and the patented device."  (Pl. Mem. at 11.)

The court is equally unpersuaded by plaintiff's argument that "by splitting the elongated member . . . the accused Brazabra Clip merely results in a reversal of parts" and that "[t]he art of bra accessories has long recognized that such reversal of parts are equivalent forms to provide the function (holding the bra strap) in the same way (by providing a gap between an elongate member and a curved member extending away) to get the same result (a bra strap held firmly in a secured position)."  (Pl. Opp. at 13.)

Plaintiff again argues in a conclusory fashion that the "main elongate portion" and "prongs" contained in plaintiff's device and different structures in the accused device represent a "reversal of parts" sufficient to establish infringement under the doctrine of equivalents.  Further, although plaintiff fails to cite any case law in support of its argument regarding the reversal of parts, the court finds that the prevailing case law regarding the reversal or transposition of claim limitations is not applicable to the devices at issue

here.  For example, in *DeMarini Sports, Inc. v. Worth, Inc.*, 239
F.3d 1314, 1332 (Fed. Cir. 2001), the Federal Circuit affirmed
the district court's finding of non-infringement and rejected
plaintiff's argument under a theory of equivalents that the
accused product was merely a reciprocal change from the claimed
product.  *Id.*  In *DeMarini*, the claimed product was a baseball
bat comprised of a hollow tubular bat frame with an interior
insert, whereas the accused product was a baseball bat comprised
of a double-walled bat frame with an exterior shell.  *Id.*  The
plaintiff in *DeMarini* argued that the accused bat achieved "the
same function (increasing the trampoline deflection), in
substantially the same way (with a leaf-spring-like action), to
achieve substantially the same result (improved hitting
performance)."  *Id.* at 1333.  Although the plaintiff contended
that "like the accused infringing device in *Corning Glass Works
v. Sumitomo Electric U.S.A., Inc.,* 868 F.2d 1251, 9 USPQ2d 1962
(Fed. Cir. 1989), [defendant's] bat presented a classic example
of transposition of two elements," the Federal Circuit
disagreed.  *DeMarini*, 239 F.3d at 1332.  The Federal Circuit
reasoned that, unlike the reversal of parts in *Corning Glass*, in
which "no structural claim limitations were rearranged, only the
relative characteristics of the structures were reciprocally
changed," the difference between the bats "involve[d] a
structural rearrangement and redefinition of claim limitations

in which the functional relationships of these structural limitations is not maintained."[3]  *Id.*  The *DeMarini* court determined that if the claimed invention's bat insert was interposed as the exterior shell of the accused product, the frame of the accused product would no longer be available for impact by the ball.  *Id.*  Thus, although reciprocal changes may, in some cases, support a finding of infringement under the doctrine of equivalents, the rearrangement of structural claim limitations does not.  *Id.* (noting that "*Corning Glass* does not authorize rearrangement of structural claim limitations").

Moreover, the Federal Circuit has held that a patent that "claims a precise arrangement of structural elements that cooperate in a particular way to achieve a certain result" is not infringed by an accused product that achieves the same result "by a different arrangement of elements."  *Sage Prods.,*

---

[3] In *Corning Glass,* the patented invention involved an optical fiber featuring a core containing a positive dopant in excess of the cladding around the core, which created a positive refractive index ("RI") differential to transmit light signals.  868 F.2d at 1255.  The accused device retained both a core and cladding layer, however, the core contained no dopant and the surrounding cladding contained a negative dopant, which similarly resulted in a positive RI differential to transmit light signals.  *Id.*  Both devices retained a core, cladding, and dopant to maintain a positive RI differential between the structures.  *Id.*  Thus, the court upheld the district court's determination that the addition of negative dopant to the cladding layer in the accused product was the equivalent of adding positive dopant to the core in the patented product.  The court noted that the insubstantial change merely substituted a known alternative way to achieve the same result and perform the same function of achieving a refractive index differential.  *Id.*  Thus, in *Corning,* no structural claim limitations were rearranged, only the relative characteristics of the structures were reciprocally changed.

*Inc. v. Devon Indus., Inc.,* 126 F.3d 1420, 1425 (Fed. Cir. 1997). In *Sage,* the Federal Circuit held that a patent for a container used for the safe disposal of medical instruments, which claimed an elongated slot *on the top* of the container body, was not literally infringed by an accused device that had an elongated slot *within* the container body. *Id.* at 1423. Focusing on the fact that the patent claimed "an elongated slot *at the top of the container body,*" *id.* at 1422, the court noted that the slot on the accused device was "not 'at the top of the container body.'" *Id.* at 1423. The court reasoned that, because Sage had failed to seek a claim with "fewer structural encumbrances," it could not later expand the scope of its patent to argue infringement under the doctrine of equivalents to encompass products that employed different structural arrangements. *Id.*

Here, plaintiff argues the "reversal of parts" between the "main elongate portion" and the "prongs" of the patent-in-suit weighs in favor of a finding that defendant's product – which purposefully uses a reciprocal arrangement from plaintiff's product – infringes under a theory of equivalence. (Pl. Mem. at 12-13.) Plaintiff's patent, however, specifies a structural arrangement where the "main elongate portion" extends across the ends of the device, and envisions a "pair of prongs . . . extending outwardly from opposite ends." (Compl. Ex. A.)

68

Moreover, each "pair of prongs" is "disposed essentially parallel" to the "main elongate portion." Thus, to transpose the "main elongate portion" with the "pair of prongs" would not be a simple transposition in which "no structural claim limitations were rearranged, only the relative characteristics of the structures were reciprocally changed." *DeMarini*, 239 F.3d at 1333.

It is not apparent to the court how to contemplate a reversal of parts that would maintain the device's strap retaining functionality or to compare such a configuration with the accused product, when the accused product does not contain "parts" or structures identical to those in the plaintiff's device that could or are reversed or transposed. Indeed, because plaintiff's patent specifies a main center piece with a pair of prongs at each end to retain brassiere straps, a "reversal of parts" would require that the position of the elongate main portion and the pair of prongs be reversed. Plaintiff has not explained or illustrated to the court how it envisions a reversal of parts with respect to its patent specification and the accused product. Rather, plaintiff merely asserts that the "unitary element," to maintain the structure of the device, and "split element," to allow entry in to the gaps, may be interchanged to achieve the same result. (Pl. Mem. at 13.) Plaintiff's patent specification, however, does not

disclose only a "unitary portion" and "split element," but rather specifies a "pair of prongs" at opposite ends of an "elongated main portion." (Compl. Ex. A. Cols. 5-6.) Plaintiff may not now generalize its claim limitations to expand the scope of its claims in order to assert a reversal of parts theory of equivalence.

Beyond relying on prior art as evidence of "known interchangeability," as discussed *supra,* plaintiff has not provided particularized evidence to explain on a limitation-to-limitation basis how the accused product is equivalent to plaintiff's patent-in-suit as required under established precedent to defeat a motion for summary judgment. *See, e.g., Eastcott*, 564 F. App'x at 594-95 (affirming grant of summary judgment of non-infringement where plaintiff failed to provide the particularized testimony on a limitation-by-limitation basis to establish the existence of a genuine issue of fact regarding infringement under the doctrine of equivalents); *Gemalto*, 754 F.3d at 1374 (citing *Texas Instruments,* 90 F.3d at 1567) (noting that particularized testimony and linking argument "assure that the fact-finder does not, 'under the guise of applying the doctrine of equivalents, erase a plethora of meaningful structural and functional limitations of the claim on which the public is entitled to rely in avoiding infringement.'"); *AquaTex,* 479 F.3d at 1328 (finding lawyer argument and

generalized testimony about the accused product insufficient to defeat a motion for summary judgment on non-infringement where infringement was alleged under doctrine of equivalents); *Stumbo*, 508 F.3d at 1365 (granting summary judgment of non-infringement where patentee failed to raise any genuine issues of material fact where expert declaration only stated in a conclusory fashion that flap openings on the accused and patented product were not "significantly different" without explaining "how either opening operated or how the differences were insubstantial."); *Motionless Keyboard,* 486 F.3d at 1382 (same); *Network Commerce, Inc. v. Microsoft Corp.*, 422 F.3d 1353, 1363 (Fed. Cir. 2005) (granting summary judgment of non-infringement where expert declaration and other evidence relied upon by plaintiff were generalized and did not provide particularized testimony and linking argument on a limitation-by-limitation basis); *Wireless Ink*, 969 F. Supp. 2d at 338 (same).

Indeed, plaintiff has not proffered any expert testimony on infringement, which is "typically" required to prove infringement under the doctrine of equivalents. *AquaTex Indus.*, 479 F.3d 1329. For the most part, plaintiff, in a conclusory and generalized fashion, asserts legal arguments, in the form of a memorandum of points and authorities, a statement of facts, a claim construction, and a declaration from plaintiff's counsel, Gerard Dunne, in support of its argument

that defendant's accused product infringes plaintiff's patents under the doctrine of equivalents. This type of evidence, without more, is insufficient. *See, e.g., Eastcott*, 564 F. App'x at 590 (plaintiff's own deposition testimony and two affidavits in opposition to defendant's summary judgment motion did not constitute particularized testimony); *AquaTex,* 479 F.3d at 1328 (finding lawyer argument and generalized testimony about the accused product insufficient to demonstrate a genuine issue of material fact to defeat summary judgment); *TechSearch,* 286 F.3d at 1371–72 (noting that "[t]he mere recital . . . that the accused device performs 'the same function, in the same way, to achieve the same result,' without more, does not create a genuine issue of material fact as to whether an accused device infringes by equivalents") (internal citation omitted).

In sum, plaintiff fails to set forth "particularized testimony and linking argument on a limitation-by-limitation basis" under well-established precedent, and in any event has not set forth sufficient evidence to raise a genuine issue of material fact to defeat a motion for summary judgment on non-infringement under a doctrine of equivalents. "The doctrine of equivalents is not a talisman that entitles a patentee to a jury trial on the basis of suspicion; it is a limited remedy available in special circumstances, the evidence for which is the responsibility of the proponent." *Schoell v. Regal Marine*

*Indus., Inc.,* 247 F.3d 1202, 1210 (Fed. Cir. 2001).

Accordingly, summary judgment is granted with respect to

plaintiff's infringement claim under the doctrine of

equivalents.

  ii. <u>Applicable Defenses to Plaintiff's Theory of
    Infringement Under the Doctrine of Equivalents</u>

    Moreover, even assuming, *arguendo*, that plaintiff had

sufficiently provided particularized testimony or other evidence

to explain on a limitation-by-limitation basis how defendant's

accused product is equivalent to plaintiff's, because the

affirmative defenses to claims under the doctrine of equivalents

– prosecution history estoppel and ensnarement – are also

questions of law, the court may grant summary judgment in favor

of non-infringement upon a finding that either of these defenses

exist and have not been sufficiently rebutted by plaintiff.

    Defendant argues that plaintiff's theory of

infringement under the doctrine of equivalents is improper

because it ensnares prior art, including the Fildan Clip and the

Wyeth Patent.[4] (Def. Mem. at 16; Def. Reply at 8.) *Gemalto*, 754

F.3d at 1374-75. The Fildan reference refers to European Patent

---

[4] The Wyeth patent refers to U.S. Patent No. 1,401,227 and is attached as
Exhibit C to the Spencer Declaration. Defendant argues that "[j]ust as
Brazabra's top structure is curved, so are Wyeth's prongs," thus plaintiff's
construction of the term "essentially disposed parallel" to read onto an
imaginary tangent line touching the accused product would improperly
encompass the Wyeth patent and it's prongs.  (Def. Mem. at 14-15.) Because
the court finds that plaintiff's theory of equivalence would improperly
ensnare the Fildan Reference, the court declines to reach the merits
regarding whether the Wyeth Patent would likewise be ensnared.

Application 1,051,926 A1 and is attached as Exhibit D to the
Spencer Declaration.  The Fildan reference is a single
brassiere-strap slide or retainer that slides vertically to
tighten or loosen a bra strap.  As shown below, two
illustrations contained in the Fildan reference patent
specification depict two varying configurations of the Fildan
reference, one of which contains a split center portion, similar
to the center portion of defendant's accused product.




Figure 5a: Fildan Reference        Figure 5b: Fildan Reference
(Spencer Decl. Ex. D)              (Spencer Decl. Ex. D)

Defendant relies on the construction Fildan provides in Figure
4, which is split in the center so that a bra strap may be slide
through the gap.  (*See* Spencer Decl. Ex. D, Fig. 4.)

        Defendant contends that its accused product is
identical to the Fildan reference, thus any attempt to capture
defendant's accused product under a theory of equivalence would
likewise ensnare the Fildan reference.  Plaintiff argues that
test for equivalents is objective and is a factual matter
reserved for the jury.  (Pl. Opp. at 9.)  Moreover, plaintiff
argues that the Wyeth patent and Fildan reference do not

anticipate plaintiff's product or the accused product under plaintiff's theory of infringement. (Pl. Opp. at 13-15.) Specifically, plaintiff contends that the Fildan reference does not disclose a product adapted to secure two bra straps close together; instead it is intended to adjust a single strap. (Pl. Opp. at 15.) Plaintiff argues that the Fildan reference discloses a "bra-strap slider" which is adapted only to lengthen and shorten a single bra strap; thus, the scope of the Fildan reference does not anticipate a product created to retain two bra straps. (Pl. Opp. at 14-15.)

Defendant, however, contends that it is uncontested that Fildan discloses that accused product's clip shape, and that the actual size of the Fildan clip has no relevance, because the Fildan patent does not limit the size or dimensions of the product. Defendant has met its burden of producing evidence of prior art to challenge a hypothetical claim. *See Interactive Pictures*, 274 F.3d at 1380. Thus, the burden of proving patentability of the hypothetical claim rests with plaintiff. *See Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371, 1380 (Fed. Cir. 2001).

The Federal Circuit has recognized that a prior art reference need not demonstrate utility in order to serve as an anticipating reference. *In re Gleave*, 560 F.3d 1331, 1335 (Fed. Cir. 2009) ("A thorough reading of our case law, however, makes

clear that a reference need disclose no independent use or utility to anticipate a claim."); *Rasmusson v. SmithKline Beecham Corp.*, 413 F.3d 1318, 1326 (Fed. Cir. 2005). Thus, that the Fildan clip was intended for one strap does not preclude a finding that the Fildan clip would be ensnared under plaintiff's theory of equivalence.

Here, defendant also introduces the prosecution history of U.S. Patent No. 6,381,752, ("Arrington Patent") to demonstrate a hypothetical claim that would cover defendant's accused product (prior to amendment), and to establish that the pre-amendment Arrington patent, which is structurally identical to defendant's accused product - was not patentable over Fildan. The Patent Office specified that the Fildan patent disclosed a device used with a brassiere that included a "ring plate" with an "unobstructed center portion," and connected sides and free edges, through which a bra strap could be inserted. (Spencer Reply Decl., Ex. K, Rejected at 3-4.)



Figure 6a: Arrington Patent
(Spencer Reply Decl. Ex. K)



Figure 6b: Arrington Patent
(Spencer Reply Decl. Ex. K)

The Patent Office also noted that Fildan disclosed an elliptical or oval shape, and that nothing prevented Fildan from being used for retaining "one element . . . for both shoulder straps as desired and as claimed." (*Id.*)  Thus, the Patent Office rejected the Arrington Application's Claims 1 through 9 as anticipated by Fildan, noting that Fildan could be used for one or two brassiere straps despite the disparity in size.  (*Id.*) Because defendant's accused product does not contain the specification in the Arrington patent which overcame the Patent Office's rejection – namely that the panels (or prongs) are situated on a different plane (*see* Figure 6b, Nos. 32 and 34) – the Fildan clip anticipates the defendant's accused product and plaintiff's product under plaintiff's proposed theory of equivalence.  (*See* Spencer Reply Decl. Ex. K.)

To the extent that plaintiff broadens the scope of its specifications to capture defendant's accused product, the court finds that it likewise captures or ensnares Fildan art. Specifically, if the scope of the patent-at-issue's "prongs" includes circle segments as plaintiff proposes, the Fildan patent would likewise have "prongs," and, because the remainder of the Fildan structure is identical to the patent-at-issue, this theory of equivalence would encapsulate the Fildan patent. Accordingly, plaintiff's theory of equivalence improperly

ensnares the Fildan patent.[5]  Because the court finds that
plaintiff's theory of infringement under the doctrine of
equivalence captures, or ensnares, the Fildan reference, the
court need not reach a determination on whether the Wyeth Patent
is also ensnared.  Defendant's motion for summary judgment on
the doctrine of equivalents is granted with respect to its
defense of ensnarement of the prior art.

## CONCLUSION

For the foregoing reasons, the court finds that the
accused product does not infringe the patent-in-suit, either
literally or under a theory of the doctrine of equivalents, and
**GRANTS** defendant's motion for summary judgment.  The Clerk of
the Court is respectfully directed to enter judgment in favor of
defendant and close this case.

---

[5] Defendant also argues that any claim of infringement under the doctrine of
equivalents is barred by prosecution history estoppel because the patentee
amended its patent during the patent application process to narrow the scope
of the claims, thus forfeiting the right to assert a claim that encompasses
certain limitations narrowed during the patent prosecution.  Specifically,
defendant argues that plaintiff is precluded from employing an interpretation
of the claim limitation "essentially disposed parallel" to encompass prongs
that are disposed with a curvature equal or greater than the prongs depicted
in the Wyeth patent.  (Def. Mem. at 14; Def. Reply at 6.)  Defendant further
contends that plaintiff is unable to establish any of the three exceptions to
rebut the presumption that prosecution history estoppel applies as a matter
of law.  *See Integrated Tech.*, 734 F.3d at 1356.  Because plaintiff has
neither produced "particularized testimony and linking argument on a
limitation-by-limitation basis," and, in any event, is estopped from
advancing its theory of equivalence due to its ensnarement of prior art, the
court need not reach a determination regarding whether plaintiff is estopped
from advancing a claim of equivalence by its prosecution history.

**SO ORDERED.**

Dated:   September 4, 2015
         Brooklyn, New York


                              _____/s/_____
                              **Kiyo A. Matsumoto**
                              United States District Judge

_____

[i] Text of Independent Claims 1, 6, 8 and 12:

Claim 1:   A bra strap retainer comprising: a retaining member having
           an ***elongate main portion and opposite end portions
           positioned at opposite ends of main portion***. Wherein each
           of said end portions includes a pair of prongs, ***each prong
           of a said pair of prongs extending outwardly from opposite
           sides of said main portion*** in substantially opposite
           directions, said prongs being spaced from said elongate
           main portion to define a slot there between; wherein ***one
           said prong of a first said pair of prongs extends inwardly
           toward another one said prong of a second said pair of
           prongs***; wherein said main portion and said prongs of said
           end portions are all disposed in the same plane; wherein
           each of said prongs has an ***outer portion which is
           essentially disposed parallel to said elongate main
           portion***, said prongs and said elongate main portion being
           adapted to retain the straps of the bra there between with
           the straps being wound through said slots between said
           prongs and said elongate main portion.

Claim 6:   A bra strap retainer comprising: a retaining member having
           an elongate main portion and opposite end portions which
           are adapted to keep straps of a bra on a user' s back in
           proximate relationship to one another, each of said end
           portions including prongs extending outwardly therefrom and
           being spaced from said elongate main portion thus defining
           a slot there between, said ***prongs being essentially
           disposed in a plane with said elongate main portion***, ***said
           prongs of each of said end portions extending outwardly
           from opposite sides of said elongate main portion, each of
           said prongs of a respective said end portion being curved
           and directed toward one of said prongs of the other said***

_**end portion**_, each of said prongs having an outer portion which is essentially disposed parallel to said elongate main portion, said prongs and said elongate main portion being adapted to retain the straps of the bra there between with the straps being wound through said slots between said prongs and said elongate main portion, one of said end portions being essentially C-shaped, and the other of said end portions being essentially an inverted C-shape.

Claim 8.    In combination: a bra with a pair of shoulder straps each having a rear section; and a bra strap retainer comprising: _**a retaining member having an elongate main portion and opposite end portions which are adapted to keep straps of a bra on a user's back in proximate relationship to one another**_, said retaining member engaging the body of the straps without holes, eyelets, or loops being part of the straps, each of said end portions . . . including prongs extending outwardly therefrom and being spaced from said elongate main portion thus defining a slot there between, said prongs being essentially disposed in a plane with said elongate main portion, said prongs of each of said end portions extending outwardly from opposite sides of said elongate main portion, each of said prongs of a respective said end portion being curved and directed toward one of said prongs of the other said end portion, each of said prongs having an outer portion which is essentially disposed parallel to said elongate main portion, one of said end portions being essentially C-shaped, and the other of said end portions being essentially an inverted C-shape; wherein each of said shoulder straps extends inward of said prongs of one of said opposite end portions with respect to the body of a wearer of said bra such that each of said end portions engages one of said shoulder straps; and wherein each of said shoulder straps extends outward of said elongate main portion with respect to the body of the wearer of the bra such that said straps being wound through said slots between said prongs and said elongate main portion.

Claim 12.  A method of preventing the slippage of bra straps off of the shoulders of a person wearing a bra, comprising: providing a bra strap retainer comprising at least a _**pair of strap-retaining members positioned at opposite ends of the retainer**_, respectively, and _**an elongated member extending between the strap-retaining members**_; positioning the bra strap retainer in the back region of the person, between the straps of a bra being worn by the person; placing a first bra strap into a retained position by placing the strap in a first pair of slots located between

the strap-retaining members and the elongated member; and placing a second bra strap into a retained position by placing the strap in a second pair of slots located between the strap-retaining members and the elongated member; wherein the bra strap retainer brings the first and second straps in close proximity with each other in a location on the person's back, thereby preventing the straps from slipping of the person's shoulder.

ADDENDUM C

US00RE43766E

(19) **United States**
(12) **Reissued Patent**
Ostaseski

(10) Patent Number: **US RE43,766 E**
(45) **Date of Reissued Patent:** **Oct. 23, 2012**

(54) **BRA STRAP RETAINER**

(76) Inventor: **Michelle D. Ostaseski**, Locust Valley, NY (US)

(21) Appl. No.: **12/575,600**

(22) Filed: **Oct. 8, 2009**

**Related U.S. Patent Documents**

Reissue of:
(64) Patent No.: **7,278,900**
    Issued: **Oct. 9, 2007**
    Appl. No.: **11/087,929**
    Filed: **Mar. 23, 2005**

U.S. Applications:
(63) Continuation-in-part of application No. 10/609,431, filed on Jun. 27, 2003, now abandoned.

(51) **Int. Cl.**
    *A41C 3/00*        (2006.01)
(52) **U.S. Cl.** ................. **450/86**; 2/336; 24/198; 24/301; 450/88; 450/1
(58) **Field of Classification Search** ................... 450/86, 450/88, 1; 2/338, 336, 326, 327, 310–312; 24/302, 198, 336, 563, 545, 300, 301, 102 A, 24/102 B, 72.7
    See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 1,401,227 | A | * | 12/1921 | Wyeth ............................... 2/323 |
| 1,536,683 | A | * | 5/1925 | Moreaux ...................... 224/220 |
| 1,782,057 | A | * | 11/1930 | Bollinger ...................... 24/301 |
| 1,792,128 | A | * | 2/1931 | Stevenson ..................... 24/371 |
| 1,804,308 | A | * | 5/1931 | Bollinger ...................... 24/515 |
| 2,140,164 | A | | 12/1938 | Moffatt |
| 2,229,021 | A | | 1/1941 | Fly |
| 2,278,153 | A | | 3/1942 | Shaulson |
| 2,444,806 | A | | 7/1948 | Cleasby |
| 2,595,139 | A | | 4/1952 | Hart |
| 2,693,625 | A | | 11/1954 | Van Buren, Jr. |
| 2,861,311 | A | * | 11/1958 | Kurland ........................ 24/300 |
| 3,126,600 | A | * | 3/1964 | Demarre ........................ 24/301 |
| 3,186,704 | A | * | 6/1965 | McCloskey et al. ............. 269/9 |
| 3,218,686 | A | * | 11/1965 | Rubenstein .................... 24/198 |
| 3,529,329 | A | | 9/1970 | Burleson |
| 4,592,118 | A | | 6/1986 | DeWoskin |
| 4,612,935 | A | | 9/1986 | Greifer |
| 4,704,745 | A | | 11/1987 | Reaver |
| 4,764,988 | A | | 8/1988 | Reaver |
| 4,953,233 | A | | 9/1990 | Moshier |
| 5,060,348 | A | | 10/1991 | Moshier |
| 5,149,293 | A | | 9/1992 | Gable |
| 5,308,278 | A | | 5/1994 | Huang |
| 5,317,788 | A | * | 6/1994 | Esposito et al. ................ 24/300 |
| 5,414,903 | A | * | 5/1995 | Porteous ........................ 24/9 |
| D363,900 | S | | 11/1995 | Roush et al. |
| 5,590,545 | A | | 1/1997 | Norris |
| 5,655,270 | A | * | 8/1997 | Boisvert ........................ 24/336 |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CA | 449605 | 7/1948 |
| CH | 324646 | 11/1957 |
| DE | 2 058 393 | 7/1971 |
| DE | 28 07 117 | 8/1978 |
| FR | 1 032 041 | 2/1951 |
| GB | 500297 | 8/1937 |

Primary Examiner — Gloria Hale
(74) *Attorney, Agent, or Firm* — Scully, Scott, Murphy & Presser, P.C.

(57) **ABSTRACT**

A bra strap retainer for preventing the straps from falling from the user's shoulders. The bra strap retainer includes a retaining member having an elongate main portion and opposite end portions which are adapted to keep straps of a bra on a user's back in proximate relationship to one another.

**15 Claims, 2 Drawing Sheets**





**US RE43,766 E**

Page 2

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,662,133 A | 9/1997 | Guido, Jr. | |
| 5,733,004 A | 3/1998 | Celestina-Krevh et al. | |
| 5,935,044 A | 8/1999 | Brewster | |
| 6,381,752 B1 | 5/2002 | Cartelli | |

* cited by examiner



FIG. 1



FIG. 2

FIG. 3



FIG. 4

US RE43,766 E

**1**

## BRA STRAP RETAINER

**Matter enclosed in heavy brackets [ ] appears in the original patent but forms no part of this reissue specification; matter printed in italics indicates the additions made by reissue.**

### CROSS REFERENCE TO RELATED APPLICATION

This application is a continuation-in-part of Application Ser. No. 10/609,431, filed Jun. 27, 2003, now abandoned, which was filed under my maiden name, Michelle D. Castro.

### BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention relates to a bra strap coupler and more particularly pertains to a new bra strap retainer for preventing the straps from falling from the user's shoulders.

2. Description of the Prior Art

The use of a bra strap coupler is known in the prior art. More specifically, a bra strap coupler heretofore devised and utilized are known to consist basically of familiar, expected and obvious structural configurations, notwithstanding the myriad of designs encompassed by the crowded prior art which have been developed for the fulfillment of countless objectives and requirements.

Known prior art includes U.S. Pat. No. 5,733,004; U.S. Pat. No. 2,140,164; U.S. Pat. No. Des. 363,900; U.S. Pat. No. 2,278,153; U.S. Pat. No. 2,595,139; U.S. Pat. No. 3,529,329; and U.S. Pat. No. 5,662,133.

While these devices fulfill their respective, particular objectives and requirements, the aforementioned patents do not disclose a new bra strap retainer. The inventive device includes a retaining member having an elongate main portion and opposite end portions which are adapted to keep straps of a bra on a user's back in proximate relationship to one another.

In these respects, the bra strap retainer according to the present invention substantially departs from the conventional concepts and designs of the prior art, and in so doing provides an apparatus primarily developed for the purpose of preventing the straps from falling from the user's shoulders.

### SUMMARY OF THE INVENTION

In view of the foregoing disadvantages inherent in the known types of bra strap coupler now present in the prior art, the present invention provides a new bra strap retainer construction wherein the same can be utilized for preventing the straps from falling from the user's shoulders.

The general purpose of the present invention, which will be described subsequently in greater detail, is to provide a new bra strap retainer which has many of the advantages of the bra strap coupler mentioned heretofore and many novel features that result in a new bra strap retainer which is not anticipated, rendered obvious, suggested, or even implied by any of the prior art bra strap coupler, either alone or in any combination thereof.

To attain this, the present invention generally comprises a retaining member having an elongate main portion and opposite end portions which are adapted to keep straps of a bra on a user's back in proximate relationship to one another.

There has thus been outlined, rather broadly, the more important features of the invention in order that the detailed description thereof that follows may be better understood, and in order that the present contribution to the art may be better appreciated. There are additional features of the invention that will be described hereinafter and which will form the subject matter of the claims appended hereto.

In this respect, before explaining at least one embodiment of the invention in detail, it is to be understood that the invention is not limited in its application to the details of construction and to the arrangements of the components set forth in the following description or illustrated in the drawings. The invention is capable of other embodiments and of being practiced and carried out in various ways. Also, it is to be understood that the phraseology and terminology employed herein are for the purpose of description and should not be regarded as limiting.

As such, those skilled in the art will appreciate that the conception, upon which this disclosure is based, may readily be utilized as a basis for the designing of other structures, methods and systems for carrying out the several purposes of the present invention. It is important, therefore, that the claims be regarded as including such equivalent constructions insofar as they do not depart from the spirit and scope of the present invention.

Further, the purpose of the foregoing abstract is to enable the U.S. Patent and Trademark Office and the public generally, and especially the scientists, engineers and practitioners in the art who are not familiar with patent or legal terms or phraseology, to determine quickly from a cursory inspection the nature and essence of the technical disclosure of the application. The abstract is neither intended to define the invention of the application, which is measured by the claims, nor is it intended to be limiting as to the scope of the invention in any way.

It is therefore an object of the present invention to provide a new bra strap retainer which has many of the advantages of the bra strap coupler mentioned heretofore and many novel features that result in a new bra strap retainer which is not anticipated, rendered obvious, suggested, or even implied by any of the prior art bra strap coupler, either alone or in any combination thereof.

It is another object of the present invention to provide a new bra strap retainer which may be easily and efficiently manufactured and marketed.

It is a further object of the present invention to provide a new bra strap retainer which is of a durable and reliable construction.

An even further object of the present invention is to provide a new bra strap retainer which is susceptible of a low cost of manufacture with regard to both materials and labor, and which accordingly is then susceptible of low prices of sale to the consuming public, thereby making such bra strap retainer economically available to the buying public.

Still yet another object of the present invention is to provide a new bra strap retainer which provides in the apparatuses and methods of the prior art some of the advantages thereof, while simultaneously overcoming some of the disadvantages normally associated therewith.

Still another object of the present invention is to provide a new bra strap retainer for preventing the straps from falling from the user's shoulders.

Yet another object of the present invention is to provide a new bra strap retainer which includes a retaining member having an elongate main portion and opposite end portions which are adapted to keep straps of a bra on a user's back in proximate relationship to one another.

3

Still yet another object of the present invention is to provide a new bra strap retainer that essentially pulls the straps on the user's back together.

Even still another object of the present invention is to provide a new bra strap retainer that is easy and convenient to wind the straps disposed upon the user's back through the bra strap retainer.

These together with other objects of the invention, along with the various features of novelty which characterize the invention, are pointed out with particularity in the claims annexed to and forming a part of this disclosure. For a better understanding of the invention, its operating advantages and the specific objects attained by its uses, reference should be made to the accompanying drawings and descriptive matter in which there are illustrated preferred embodiments of the invention.

BRIEF DESCRIPTION OF THE DRAWINGS

The invention will be better understood and objects other than those set forth above will become apparent when consideration is given to the following detailed description thereof. Such description makes reference to the annexed drawings wherein:

FIG. 1 is a side elevational view of a new bra strap retainer according to the present invention and being shown in use.

FIG. 2 is a detailed side elevational view of the present invention.

FIG. 3 is an edge elevational view of the present invention.

FIG. 4 is a side elevational view of an embodiment of the present invention.

DESCRIPTION OF THE PREFERRED EMBODIMENT

With reference now to the drawings, and in particular to FIGS. 1 through 4 thereof, a new bra strap retainer embodying the principles and concepts of the present invention and generally designated by the reference numeral 10 will be described.

As best illustrated in FIGS. 1 through 3, the bra strap retainer 10 generally comprises a retaining member 25 having an elongate main portion 11 and opposite end portions 12, 13 which are adapted to keep straps 22, 23 of a bra on a user's back 24 in proximate relationship to one another. Each of the end portions 12, 13 includes prongs 14 through 17 integrally extends outwardly therefrom and is spaced from the elongate main portion 11 thus defining a slot 18, 21 therebetween. The prongs 14 through 17 are essentially disposed in a plane with the elongate main portion 11 with the prongs 14 through 17 of each of the end portions 12, 13 extending outwardly from opposite side edges of the elongate main portion 11. Each of the prongs 14 through 17 of a respective end portion 12, 13 is curved and directed toward one of the prongs 14 through 17 of the other end portion 12, 13. Each of the prongs 14 through 17 has an outer portion which is essentially disposed parallel to the elongate main portion 11 with the prongs 14 through 17 and the elongate main portion 11 being adapted to retain the straps 22, 23 of the bra therebetween and with the straps 22, 23 being wound through the slots 18 through 21 between the prongs 14 through 17 and the elongate main portion 11. One of the end portions 12, 13 is essentially C-shaped, and the other of the end portions 12,13 is essentially an inverted C-shape.

Preferably, the retaining member 25 is substantially planar and does not extend out of a single plane, so that the profile of

4

the retaining member beneath the garments of the wearer is minimized and less noticeable.

In one embodiment, the retaining member 25 has a length of approximately 1 inch and a thickness of approximately ⅛ inch with each end portion having a width of approximately 1 inch. In another preferred embodiment, the overall length of the retaining member 25 is approximately 2 inches, and the overall width is approximately one and one-half inches In yet another, larger embodiment, the retaining member 25 has an overall length of approximately two and one-half inches, and an overall width of approximately two inches.

In a variation of the aforedescribed embodiments, a bra strap retainer 30 (see FIG. 4) has a configuration similar to the embodiment 10, but significantly includes an elastomeric material that forms at least a section of the main portion 11a of the retainer 30. Beneficially, this elastomeric material provides the desired biasing of the straps toward each other, while providing a degree of flexibility and release during, for example, big or quick movements of the wearer. In at least one embodiment, this is implemented by forming a hole 32, 33 in each of the respective opposite end portions 12a, 13a toward a central location on the end portions, and an elastomeric band 34 extends through and between the holes 32, 33. In one embodiment, the length of the main portion 11a is approximately 4 inches in a relaxed, unstretched condition. It is contemplated that, in a stretched condition, the length of the main portion 11a could be extended by approximately 150 to 200 percent (e.g., from 4 inches to 6 to 8 inches) or possibly more. The end portions 12a, 13a are preferably formed of a somewhat rigid, but also resiliently flexible material, such as a suitable plastic material.

Optionally, the prongs 14a, 15a, 16a, and 17a may be more curved (is comparison to the aforedescribed embodiment 10) so that the prongs are angled more toward to opposite prong of the opposite end portion 12a, 13a.

In use, the user takes a portion of one of the straps 22, 23 disposed upon one's back 24 and winds it through the slots 18 through 21 between the elongate main portion 11 and the prongs 14 through 17 of one of the end portions 12, 13, and then takes a portion of the strap 22, 23 disposed upon one's back 24 and winds it through the slots 18, 21 between the elongate main portion 11 and the prongs 14 through 17 of the other end portion 12, 13 to essentially bring the two straps 22, 23 in close proximity of one another upon the user's back 24 to prevent the straps 22, 23 falling down from one's shoulders.

As to a further discussion of the manner of usage and operation of the present invention, the same should be apparent from the above description. Accordingly, no further discussion relating to the manner of usage and operation will be provided.

With respect to the above description then, it is to be realized that the optimum dimensional relationships for the parts of the invention, to include variations in size, materials, shape, form, function and manner of operation, assembly and use, are deemed readily apparent and obvious to one skilled in the art, and all equivalent relationships to those illustrated in the drawings and described in the specification are intended to be encompassed by the present invention.

Therefore, the foregoing is considered as illustrative only of the principles of the invention. Further, since numerous modifications and changes will readily occur to those skilled in the art, it is not desired to limit the invention to the exact construction and operation shown and described, and accordingly, all suitable modifications and equivalents may be resorted to, falling within the scope of the invention.

5

I claim:

1. A bra strap retainer comprising:
a retaining member having an elongate main portion and opposite end portions positioned at opposite ends of said main portion;
wherein each of said end portions includes a pair of prongs, each prong of a said pair of prongs extending outwardly from opposite sides of said main portion in substantially opposite directions, said prongs being spaced from said elongate main portion to define a slot therebetween;
wherein one said prong of a first said pair of prongs extends inwardly toward another one said prong of a second said pair of prongs;
wherein said main portion and said prongs of said end portions are all disposed in the same plane;
wherein each of said prongs has an outer portion which is essentially disposed parallel to said elongate main portion, said prongs and said elongate main portion being adapted to retain the straps of the bra therebetween with the straps being wound through said slots between said prongs and said elongate main portion.

2. A bra strap retainer as described in claim 1, wherein said main portion is formed substantially of an elastomeric material being resiliently extensible in length and said end portions are formed substantially of a flexible and non-stretchable material.

3. A bra strap retainer as described in claim 1, wherein each of said prongs of a respective said end portion is curved.

4. A bra strap retainer as described in claim 1, wherein one of said end portions is substantially C-shaped, and the other of said end portions is substantially an inverted C-shape.

5. A bra strap retainer as described in claim 1, wherein said retaining member engages the body of the straps without holes, eyelets, or loops being part of the straps.

6. A bra strap retainer comprising:
a retaining member having an elongate main portion and opposite end portions which are adapted to keep straps of a bra on a user's back in proximate relationship to one another, each of said end portions including prongs extending outwardly therefrom and being spaced from said elongate main portion thus defining a slot therebetween, said prongs being essentially disposed in a plane with said elongate main portion, said prongs of each of said end portions extending outwardly from opposite sides of said elongate main portion, each of said prongs of a respective said end portion being curved and directed toward one of said prongs of the other said end portion, each of said prongs having an outer portion which is essentially disposed parallel to said elongate main portion, said prongs and said elongate main portion being adapted to retain the straps of the bra therebetween with the straps being wound through said slots between said prongs and said elongate main portion, one of said end portions being essentially C-shaped, and the other of said end portions being essentially an inverted C-shape.

7. The bra strap retainer of claim 6 wherein said main portion is formed substantially of an elastomeric material being resiliently extensible in length and said end portions are formed substantially of a flexible and non-stretchable material.

8. In combination:
a bra with a pair of shoulder straps each having a rear section; and
a bra strap retainer comprising:
a retaining member having an elongate main portion and opposite end portions which are adapted to keep straps of a bra on a user's back in proximate relationship to one another, said retaining member engaging the body of the straps without holes, eyelets, or loops being part of the straps, each of said end portions

6

including prongs extending outwardly therefrom and being spaced from said elongate main portion thus defining a slot therebetween, said prongs being essentially disposed in a plane with said elongate main portion, said prongs of each of said end portions extending outwardly from opposite sides of said elongate main portion, each of said prongs of a respective said end portion being curved and directed toward one of said prongs of the other said end portion, each of said prongs having an outer portion which is essentially disposed parallel to said elongate main portion, one of said end portions being essentially C-shaped, and the other of said end portions being essentially an inverted C-shape;
wherein each of said shoulder straps extends inward of said prongs of one of said opposite end portions with respect to the body of a wearer of said bra such that each of said end portions engages one of said shoulder straps; and
wherein each of said shoulder straps extends outward of said elongate main portion with respect to the body of the wearer of the bra such that said straps being wound through said slots between said prongs and said elongate main portion.

9. The combination of claim 8 wherein said retaining member has a length of approximately 1 inch and a thickness of approximately ⅛ inch with each end portion having a width of approximately 1 inch.

10. The combination of claim 8 wherein said main portion of said bra strap retainer is formed substantially of an elastomeric material being resiliently extensible in length and said end portions of said bra strap retainer are formed substantially of a flexible and non-stretchable material.

11. The combination of claim 8 wherein each of said slots has a depth and each of said straps has a width, the depth of each of said slots being between at least approximately 50% of said width of said strap.

12. A method of preventing the slippage of bra straps off of the shoulders of a person wearing a bra, comprising:
providing a bra strap retainer comprising at least a pair of strap-retaining members positioned at opposite ends of the retainer, respectively, and an elongated member extending between the strap-retaining members;
positioning the bra strap retainer in the back region of the person, between the straps of a bra being worn by the person;
placing a first bra strap into a retained position by placing the strap in a first pair of slots located between the strap-retaining members and the elongated member; and
placing a second bra strap into a retained position by placing the strap in a second pair of slots located between the strap-retaining members and the elongated member;
wherein the bra strap retainer brings the first and second straps in close proximity with each other in a location on the person's back, thereby preventing the straps from slipping off the person's shoulder.

13. The method of claim 12, wherein the bra strap retainer comprises strap-retaining members positioned at opposite ends of the elongated member.

14. The method of claim 12, wherein each strap-retaining member is curved inward towards the opposite strap-retaining member.

15. The method of claim 13, wherein the elongated member extends across the bra strap retainer from opposite ends of the bra strap retainer.

\* \* \* \* \*

## CERTIFICATE OF SERVICE & CM/ECF FILING

## 16-1057

I hereby certify that I electronically filed the **Corrected Brief for Plaintiff-Appellant** using the Court's Case Management/Electronic Case Filing system, which will send a "Notice of Docket Activity" to the below-listed counsel.  One (1) copy of the brief was sent via Federal Express Next Business Day Delivery to:

Milton Springut
Tal s. Benschar
Springut Law PC
45 Rockefeller Plaza, 20th Floor
New York, New York 10111
(212) 813-1600
ms@springutlaw.com
tbenschar@springutlaw.com

*Attorneys for Defendant-Appellee*

Upon acceptance by the Court of the e-filed document, the required paper copies will be timely filed in the United States Court of Appeals for the Federal Circuit.

on this 9th day of December 2015.

Respectfully submitted,

/s/ Gerard F. Dunne
Gerard F. Dunne
Attorney for Appellant
41 Union Square West, Suite 1125
New York, NY  10003
(212) 645-2410
Jerry.dunne@dunnelaw.net

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because it contains 5,536 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

New York, NY
Dated: December 8, 2015                    Respectfully submitted,

                                    /s/ Gerard F. Dunne
                                    Gerard F. Dunne
                                    Attorney for Appellant
                                    41 Union Square West, Suite 1125
                                    New York, NY  10003
                                    (212) 645-2410
                                    Jerry.dunne@dunnelaw.net